The **MAY DEPARTMENT STORES COMPANY, Petitioner and Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent and Cross-Petitioner.**

Nos. 81–7694, 81–7791.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 11, 1982.

Decided June 1, 1983.

Richard L. Lotts, Los Angeles, Cal., for petitioner and cross-respondent.

Susan L. Williams, Washington, D.C., for respondent and cross-petitioner.

Before WALLACE, KENNEDY, and PREGERSON, Circuit Judges.

KENNEDY, Circuit Judge:

In an NLRB representation election held by the May Department Stores Company ("the Company"), a majority of the employees voted for the union—a local of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America. The Company objected to the election on the ground that union agents and supporters had created an atmosphere of fear and intimidation.

The Regional Director conducted an ex parte investigation of the Company's objections and overruled them. He denied the Company's request for a formal evidentiary hearing, and certified the union as a bargaining representative. The NLRB declined to review his decision. The employer refused to bargain with the union and, upon a charge by the Teamsters Local, the Board issued a bargaining order. The issue before us is whether the specific misconduct alleged by the employer was too substantial for the Regional Director to dismiss the Company's objections without an evidentiary hearing. We hold that it was, and vacate the Board's bargaining order.

The employer in this case alleged numerous threats of reprisal. Three employees testified that they were warned, in substance, that "if the Union lost the election, those employees who voted for the Employer would have their windows of their cars broken and their tires slashed in the parking lot." Another heard rumors to the same effect. One of them described the threat as follows:

> [The union adherent] said that if the union loses the election, they will flatten tires and break windows of the cars of the people they know are pro-Company and that there will be a bloody day on Monday. She then said to me don't forget to vote for the union. She pointed her finger at me when she made this last statement. I am afraid of Angie because of these things she has told me.

Record at 57. One pro-company employee did not drive his car to work for the three weeks before the election "because I was afraid that it would be damaged." Record at 118.

The Regional Director noted that "the Employer presented numerous statements from employees relating to . . . threats of

physical harm and assaults by pro-[union] employees." One employee wearing a company T-shirt was told "if you don't take that T-shirt off, something is going to happen to you." Several were told "they had better not wear May Company T-shirts the next day, or the other employees would get them after work." A pro-company advocate was warned that if he did not stop vocally opposing the union he would be assaulted. Another swore he was told, "if I didn't change my mind on the union, then they will be waiting outside for me." Record at 117. A number of union adherents spread rumors that "if the Union lost the election, it would call Immigration" to "come to the Employer's premises and take away undocumented workers." Other rumors warned that INS would be present on election day for the same purpose, and, therefore, one could infer, that illegal aliens, who apparently disproportionately supported the company, should not attempt to vote. Many employees testified that there were rumors that the union would do what it could to see that anti-union employees lost their jobs if the union won the election.

The employer also produced evidence of physical assaults, usually of a minor, if offensive, nature. At one demonstration held on election day, in front of the main entrance to one of the employer's buildings, union adherents placed union stickers on unwilling employees. There were no incidents of actual violence more serious than this incident or intentional "bumping" of pro-company employees by pro-union employees; no employee said he changed his or her vote or did not vote because of the alleged threats, although some did allege they were intimidated. An affidavit by one of the employer's attorneys said that some employees were afraid to testify for fear of retaliation by the union or its supporters. Record at 139.

The Regional Director rejected the employer's challenge to the election, without an evidentiary hearing. He did not consider the incidents themselves, although supported by twenty-four employee statements, sufficiently coercive to create an atmosphere in which the free choice of employees could not be registered. He significantly discounted the seriousness of the threats and assaults alleged because the offending employees were not agents of the Union, but only third parties.

The Board's wide discretion in supervising representation elections, and certifying the successful union, is well-established. *NLRB v. Advanced Systems, Inc.,* 681 F.2d 570 (9th Cir.1982). When the Board determines that a participant's objections to the conduct of the election are too flimsy to merit an evidentiary hearing, its decision can only be set aside if it has abused its discretion.[1] *Id.*

The *Advanced Systems* case sets forth the standards for determining whether the Board has abused its discretion. A hearing on election objections need not be granted unless the objecting party has made "a prima facie showing of substantial material factual issues that would, if true, warrant setting aside the election." *Id.* Coercive misconduct only warrants the setting aside of an election when it "so influenced potential voters that a free choice [became] impossible." *Id.* at 575. In assessing the impact of such misconduct, we accord less weight to third party misconduct than we do to misconduct directly attributable to the union or the employer. *Id.* Third party misconduct must be a great deal more aggravated than union or employer misconduct before we deem it sufficient to overturn an election.

In *NLRB v. Sauk Valley Manufacturing Co., Inc.,* 486 F.2d 1127 (9th Cir.1973), we recognized two reasons for discounting third party misconduct. First, the employees will attach less significance to "possibly impulsive" actions of their fellow employees

---

1. That some other circuits apply a "question of law" review rather than an "abuse of discretion" review is, in this context, largely a semantic difference. Other circuits, like our court, give significant, but not unlimited, deference to the Board. *See, e.g., NLRB v. Claxton Mfg. Co.,* 613 F.2d 1364, 1365–66, *modified,* 618 F.2d 396 (5th Cir.1980).

which are "induced in the heat of a campaign" rather than planned by the union or the employer. *Id.* at 1131 n. 5. A second and broader ground is that since "as a practical matter, unions and employers cannot prevent misdeeds or misstatements by those over whom they have no control," giving great weight to such actions would lead to endless and pointless repetitions of elections. *Id.*

■ In the case before us, the Regional Director concluded too readily that the employees responsible for the misconduct were not union agents. Under the National Labor Relations Act, "the Union's responsibility for acts by its officers and members is controlled by common law agency principles," *NLRB v. Advanced Systems, supra,* at 576, and implied or apparent authority is sufficient to establish such agency.[2] *Id.* The known events in this dispute as well as affidavits submitted by the Company make it a material issue whether the numerous. offending employees were union agents. The Regional Director could not dispose of this material issue in his ex parte investigation, especially since he admitted to relying in part on evidence submitted by the union that was unknown to the Company and therefore was never subject to any kind of challenge, rebuttal, or cross-examination by it.

The Regional Director noted that, in this case, the union "trained the committee persons and represented them to other employees as people who could answer their questions" and found their "authorized acts" were "answering certain questions of other employees relating to what the Union could do for employees, encouraging attendance at Union meetings and soliciting support for the [Union] at the election." Despite these findings, the Regional Director concluded, apparently as a matter of law, that the members of the In Plant Organizing Committee were not union agents even in performing misconduct with an apparent intention to serve the union. To quote the relevant language of the Regional Director:

> The activities of the committee herein involved closely parallel those of the committee in *International Ladies' Garment Workers' Union, AFL–CIO (Georgetown Dress Corporation )*, 214 NLRB 706. Thus, the members of the committees were employees of the Employer, their activities took place at the Employer's premises, there is no evidence that the [Union] knew of or condoned the alleged threats, the employees were not paid for their activities on behalf of the Petitioner and they acted in their own interest. Further, membership in the committee was open to all employees. . . .

Board counsel on this appeal add that the union did not allow the Committee to do all the organizing work, but itself maintained an active organizing presence.

While some of these circumstances may argue against a finding of agency as to particular acts of Committee members, they do not indicate the issue of agency can be decided without prior factual determinations. The Regional Director's analysis derives from a Board precedent which the Fourth Circuit rejected in *NLRB v. Georgetown Dress Corp.,* 537 F.2d 1239 (4th Cir. 1976). Since we have approved the Fourth Circuit's *Georgetown Dress* reasoning, and the common law principles to which it is faithful, *NLRB v. Advanced Systems, supra,* we must reject the Regional Director's

**2.** *See also* Restatement (Second) of Agency §§ 1, 26, 27 (1958), which state:
Section 1: (Definition of Agency)
(1) Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.
Section 26: (Creation of Authority)
[A]uthority to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account.
Section 27: (Creation of Apparent Authority)
[A]pparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.

conclusion in this case that lack of agency was shown as a matter of law.

In *Advanced Systems* we held that "the Company's well-pleaded factual assertions raise a substantial and material issue whether [the employee in question] had apparent authority despite the presence at the plant of the professional organizers and despite their instructions not to threaten employees." *Id.* at 576. The same must be said here, where there is no evidence that the misconduct was specifically against union orders. The Regional Director therefore erred in resolving the agency issue he viewed as controlling without an evidentiary hearing on the actual or apparent authority of the Committee members.

The Board's error here is even more apparent when we note its findings in a proceeding collateral to the case before us. Relying on some of the very misconduct that it alleges as grounds for challenging the election in this case, the Company dismissed an employee, for which it was charged with an unfair labor practice. In exonerating the Company, the administrative law judge noted the seriousness of the threats made by the discharged employee. In the final analysis, [IPOC] committee members had been appointed by the Union to solicit support for it in the upcoming election. By virtue of her status as a committee member, Guido had been "in the eyes of other employees [one of] the representatives of the [U]nion on the scene and the [U]nion authorized her to occupy that position." *NLRB v. Georgetown Dress Corp.*, 537 F.2d 1239, 1244 (C.A.4, 1976).

Cases 21–CA–19595, 20062, ALJ decision at 10 (Dec. 30, 1981). While the administrative law judge in that case was not required to find agency to reach his conclusion, his recognition that the Committee member involved was a representative of the union "in the eyes of other employees" is closely enough related to a finding of agency to show that the Regional Director in this case erroneously reached a contrary result without the benefit of a hearing. The finding illustrates the kind of factual matters that bear on the question of union agency.

Even if union agency were not a material issue in this case, the numerous threats of physical harm, property damage, and job loss noted in the record create a substantial and material issue whether the misconduct was so aggravated that it made a free choice impossible. The threats here, and the potential for coercion, appear to us, potentially at least, to be more serious than those either in *Masonic Homes of California, Inc.*, 624 F.2d 88 (9th Cir.1980), where the Board set the election aside, or in *Sonoco of Puerto Rico, Inc.*, 210 N.L.R.B. 493, 493–94 (1974), where an evidentiary hearing was found to be required.

The Regional Director bolstered his decision by noting that there was no evidence that employees changed their vote or declined to vote because of the alleged misconduct. While such evidence is relevant to the Board's consideration, it is not a prerequisite to an order for new elections. The Board has consistently held that whether an election should be invalidated based on alleged misconduct "does not turn on election results but rather upon an analysis of the character and circumstances of the alleged objectionable conduct." *Steak House Meat Co.*, 206 N.L.R.B. 28, 29 (1973). It is sufficient if the conduct is "coercive" and has "a tendency to affect or interfere with the employees' actions at the polls." *Professional Research, Inc. d/b/a Westside Hospital*, 218 N.L.R.B. 96, 96–97 (1975); *accord Central Photocolor Co.*, 195 N.L.R.B. 839, 839 (1972); *Greenpark Care Center*, 236 N.L.R.B. 683, 684 (1978).

For the reasons set forth, we deny the motion to enforce the Board's order and remand to the Board for further proceedings.

PETITION GRANTED; ENFORCEMENT DENIED.