815 F.2d 225
 125 L.R.R.M. (BNA) 2832, 106 Lab.Cas. P 12,300
 AMALGAMATED SERVICE AND ALLIED INDUSTRIES JOINT BOARD,
AMALGAMATED CLOTHING and TEXTILE WORKERS UNION,
AFL-CIO, CLC, Petitioner,
Angelica Healthcare Services Group, Inc., Petitioner, Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner.
 Nos. 818, 819, Dockets 86-4101, 86-4161 and 86-4163.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 13, 1987.
Decided March 27, 1987.
 
 Larry Cary, New York City for petitioner Amalgamated Service and Allied Industries Joint Board, Amalgamated Clothing and Textile Workers Union, AFL-CIO, CLC.
 Howard L. Mocerf, St. Louis, Mo. (Tockman & Wolk, of counsel), for petitioner-cross-respondent, Angelica Healthcare Services Group, Inc.
 William R. Stewart, Deputy Asst. Gen. Counsel, N.L.R.B., Washington, D.C. (Frances H. O'Connell, Atty., Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., of counsel), for respondent-cross-petitioner, N.L.R.B.
 Before FEINBERG, Chief Judge, PIERCE and MINER, Circuit Judges.
 FEINBERG, Chief Judge:
 
 
 1
 We are asked in these three consolidated petitions to review an order issued by the National Labor Relations Board (the Board) against Angelica Healthcare Services Group, Inc. (the Company) following a representation election won by the Amalgamated Service and Allied Industries Joint Board, Amalgamated Clothing and Textile Workers Union, AFL-CIO, CLC (the Union). The Company petitions for review of the order claiming that the election must be set aside, and the Board cross-petitions for enforcement of its order. The Union also petitions for review of the Board order claiming that it should have been granted additional remedies. For the reasons that follow, we enforce the order and deny the petitions of the Company and the Union.
 
 I. Background
 
 2
 In April 1985, the Union won an election at the Company's plant in Milford, Connecticut, by a margin of 69 to 61, with one challenged vote. The Company filed timely objections to the election arguing that Union observers had engaged in conversations with employees waiting to vote, some employees had chanted pro-Union messages near the polling area and Board agents had failed to prevent such conduct. A hearing to consider the Company's objections was held before an administrative law judge (ALJ), who recommended that the Board certify the Union as the representative of the Company's production and maintenance employees. The Company filed exceptions to these recommendations. The Board rejected the exceptions and certified the Union as the unit's bargaining representative.
 
 
 3
 Following the Company's refusal to bargain with the certified Union, the General Counsel of the Board issued a complaint alleging that the refusal violated section 8(a)(1) and (5) of the National Labor Relations Act (the Act), 29 U.S.C. Sec. 158(a)(1) and (5). The Company answered that the certification was invalid because of the objections it had raised. The General Counsel moved for summary judgment and the Union filed a supporting memorandum in which the Union requested additional remedies. In June 1986, the Board issued its decision and order, rejecting the Company's objections, granting the motion for summary judgment and rejecting the additional remedies requested by the Union. The Board ordered the Company to bargain with the Union and to cease and desist from violating the Act in various respects by refusing to bargain. 280 NLRB No. 100 (1986).
 
 
 4
 The Company petitioned for review of the Board order in the United States Court of Appeals for the Seventh Circuit. The Board's cross-petition for enforcement and the Union's request for review were consolidated with the Company's petition, and the three petitions were subsequently transferred from the Seventh Circuit to this court.
 
 II. Standard of Review
 
 5
 "The conduct of representation elections is the very archetype of a purely administrative function, with no quasi about it, concerning which courts should not interfere save for the most glaring discrimination or abuse." NLRB v. Olson Bodies, Inc., 420 F.2d 1187, 1189 (2d Cir.1970), cert. denied, 401 U.S. 954, 91 S.Ct. 966, 28 L.Ed.2d 237 (1971); see also NLRB v. Newton-New Haven Co., 506 F.2d 1035, 1037 (2d Cir.1974). Courts defer to the expertise that the Board has developed in supervising elections. Thus, in reviewing a request to overturn a Board decision refusing to set aside an election, the proper standard is whether the Board abused its discretion. Lipman Motors, Inc. v. NLRB, 451 F.2d 823, 827 n. 8 (2d Cir.1971).
 
 
 6
 Throughout its briefs, the Company emphasizes that if the Board fails to maintain "laboratory conditions" for the conduct of an election, see General Shoe Corp., 77 NLRB 124, 127 (1948), enforced, 192 F.2d 504 (6th Cir.1951), cert. denied, 343 U.S. 904, 72 S.Ct. 635, 96 L.Ed. 4323 (1952), the election must be invalidated. The idea of laboratory conditions is a useful guide for measuring the conduct of an election. However, it is probably not possible to completely achieve such ideal conditions, and elections will not automatically be voided whenever they fall short of that standard. Rather, the idea of laboratory conditions must be realistically applied. The Board has broad discretion to determine whether the circumstances of an election come sufficiently close to laboratory conditions so that employees can exercise free choice in deciding whether to select the Union as their representative.
 
 
 7
 In this case, the Board adopted the ALJ's specific findings of fact regarding each of the Company's objections. Because the parties do not dispute any significant finding by the ALJ, we accept the undisputed findings as true in deciding whether the Board abused its discretion.
 
 III. The Company's Objections
 A. Perez's Conversation
 
 8
 The Company argues that the election must be set aside because Vincent Perez, a Union observer, spoke with an employee who was waiting in line to vote. The ALJ made the following findings:
 
 
 9
 ... [E]mployee Mildred Gelormine, who had been out of work on disability since November, 1984, appeared to vote. [Company observer Adelaide] Tamilio asked her name. Gelormine asked Tamilio how she was. Tamilio did not answer. Gelormine asked Union observer Vincent Perez how he was, and he answered "fine, how are you?" Gelormine and Perez then spoke about her injury, condition, surgery, prognosis and when she would return to work. At that time, 1 voter was in the voting booth, 1 was waiting to vote ballot in hand and 5 or 6 were lined up at the table. Gelormine continued to talk--"wouldn't stop." The conversation, which lasted 2 to 3 minutes ended when Tamilio "nudged Perez to be quiet," and he said he was sorry--he forgot that he was not supposed to hold a conversation.
 
 
 10
 The Company argues that Perez's conduct is proscribed by Milchem, Inc., 170 NLRB 362 (1968). In Milchem, the Board established a standard for determining whether to set aside an election because of conversations between parties to the election and employees waiting to vote. The Board stated:
 
 
 11
 [T]he potential for distraction, last minute electioneering or pressure, and unfair advantage from prolonged conversations between representatives of any party to the election and voters waiting to cast ballots is of sufficient concern to warrant a strict rule against such conduct, without inquiry into the nature of the conversations.
 
 
 12
 ....
 
 
 13
 We intend, of course, that our application of this rule will be informed by a sense of realism. The rule contemplates that conversations between a party and voters while the latter are in a polling area awaiting to vote will normally, upon the filing of proper objections, be deemed prejudicial without investigation into the content of the remarks. But this does not mean that any chance, isolated, innocuous comment or inquiry by an employer or union official to a voter will necessarily void the election. We will be guided by the maxim that "the law does not concern itself with trifles."
 
 
 14
 Milchem, 170 NLRB at 362-63. In Milchem, a union official spoke for about five minutes with approximately 15 employees waiting to vote. The Board found that such conduct "could not, in any view of the evidence, be dismissed as minimal" and voided the election without considering the content of the conversation.
 
 
 15
 Subsequent cases involving the Milchem rule have abided by the Board's instruction that the application of the rule be "informed by a sense of realism." Whether a conversation is "prolonged" within the meaning of Milchem is "determined by examining the cumulative effect of the party agent(s)' conduct." Bio-Medical Applications of Puerto Rico, Inc., 269 NLRB 827, 830 (1984). "[T]he Board has not allowed the so-called 'per se' Milchem rule to invalidate elections wholesale." Certainteed Corp. v. NLRB, 714 F.2d 1042, 1061 (11th Cir.1983). Instead, the Board has often considered the substance of a conversation in determining whether it is "objectionable" under Milchem. See, e.g., Cumberland Nursing & Convalescent Center, 248 NLRB 322, 323 n. 8 (1980). The Milchem rule also has been applied to conversations between voters and a party's election observers, such as the ones that occurred in this case. See Modern Hard Chrome Service Corp., 187 NLRB 82 (1970).
 
 
 16
 The Board here concluded that Perez's conduct was not proscribed by the Milchem rule because the conversation lasted two to three minutes, less than the five-minute conversation in Milchem, and was isolated and innocuous. The Board held that the cumulative effect of Perez's conduct did not justify voiding the election. The Company argues that the Board did not undertake a proper analysis of Perez's conduct. The Company reads Milchem to impose a two-step inquiry. The first step is to decide whether the conversation is "prolonged," based only on the length of the conversation. The Company argues that United Supermarkets, Inc., 261 NLRB 1291 (1982), established that a two-minute conversation is "prolonged" under Milchem. Under the Company's view, only if the conversation lasts less than two minutes is the second step of the inquiry applied, to determine whether the content or effect of the conversation may nevertheless make the conversation objectionable.
 
 
 17
 We are unpersuaded by the Company's analysis of Milchem because it takes an overly narrow view of what constitutes a "prolonged" conversation. Under Milchem, 170 NLRB at 363, a "chance, isolated, innocuous comment or inquiry" will not "necessarily void the election." Admittedly, for conversations that last as long as five minutes, it may be unnecessary under some circumstances to look at the substance of the comments. In those situations, the cumulative effect of the length of the conversation is objectionable, even if the substance of the comments is innocuous. The Company, however, has not cited any cases where the Board has held a conversation lasting less than five minutes to be necessarily "prolonged," and thus objectionable, and we see no reason to adopt such a rule.
 
 
 18
 The two-minute conversation in United Supermarkets justified setting aside the election because of the cumulative effect of the conversation under the circumstances of that case. In addition to the conversation, the employer had committed unfair labor practices that provided further justification for setting aside the election. Id. at 1316. Furthermore, unlike the present case, the Board in United Supermarkets could not determine whether the comments in that case were innocuous. A per se rule that any two-minute conversation requires voiding an election would lead to the needless invalidation of elections even when the conversation was innocuous and had no effect on the exercise of free choice by employees. Thus, the Board was justified in declining to adopt the per se rule urged by the Company in this case. See Midwest Stock Exchange v. NLRB, 620 F.2d 629, 634 (7th Cir.), cert. denied, 449 U.S. 873, 101 S.Ct. 214, 66 L.Ed.2d 94 (1980).
 
 
 19
 The Company also contends that the conversation was distracting because it was witnessed by seven or eight employees. The witnessing of conversations, however, is not necessarily a distraction. Whether Perez's conversation with the employee in this case created a distraction depended on the surrounding circumstances, and is a matter within the Board's expertise to make a determination. The Board found no distraction. The Company has not offered any persuasive reason to show that the Board did not properly exercise its discretion. We therefore conclude that the Board did not act improperly in finding Perez's conduct to be unobjectionable.
 
 B. Caez's Conversations
 
 20
 The Company argues that Miryam Caez, another Union observer, engaged in several conversations that are objectionable under Milchem. While seated at the observers' table in the voting room, Caez spoke with one employee for about 30 seconds, then a few minutes later, with another employee for about 30 seconds, and later, with a group of three or four employees for about 90 seconds. All three conversations were conducted in Spanish. Because the Company's observer who witnessed the conversations did not understand Spanish, the content of the conversations was not known.[1] The Board found these conversations to be brief and isolated, and unobjectionable.
 
 
 21
 The Company contends that Caez's conversations cumulatively took up a significant part of the voting period, which the Company claims lasted only one-half hour. The Company again places weight on the number of employees waiting to vote when the conversations occurred. The Company claims that about six employees were waiting to vote during the first conversation, about two or three employees during the second conversation and about eight during the third conversation.
 
 
 22
 The Company relies on Volt Technical Corp., 176 NLRB 832 (1969), for the proposition that a series of conversations can create a potential for interference sufficient to void an election, even though each conversation by itself is brief. In Volt, a company supervisor went along the voting line "talking to people, slapping them on the back and shaking hands with them." Id. at 836. This lasted for almost the entire one-hour voting period. This supervisor previously had expressly asked each of his employees to vote against the union. Id. The Company's reliance on Volt is misplaced since Caez's conduct in this case was not nearly as extensive. Caez's three conversations were only 30, 30 and 90 seconds long, respectively. In addition, Caez as an election observer was less likely to influence employees than the supervisor in Volt, who had a position of authority over the employees. Volt therefore does not require the Board to set aside this election, and it was not an abuse of discretion for the Board to conclude that Caez's conversations were brief and isolated.
 
 C. Employee Chanting
 
 23
 The Board found that during the first half of a one-hour voting period, a group of employees chanted "vote union" or "go union" very briefly two or three times. The chanting took place in an area that employees passed on their way to the voting room, which was about 25 to 35 feet away. The area was separated from the voting room by a six-inch thick cinderblock wall having two large openings. Because of the noise in the area, the chanting could not be understood in the voting room. The Company argues that the chanting is objectionable under Alliance Ware, Inc., 92 NLRB 55 (1950), Claussen Baking Co., 134 NLRB 111 (1961), and NLRB v. Carroll Contracting & Ready-Mix, Inc., 636 F.2d 111 (5th Cir.1981). The Company does not contend that the Union organized the chanting. Therefore, the Board applied the test it uses when the claimed disruption is by nonparties (employees), which is whether the chanting "so substantially impaired the employees' exercise of free choice as to require that the election be set aside." Southeastern Mills, Inc., 227 NLRB 57, 58 (1976). The Board ruled that the chanting did not require invalidating the election.
 
 
 24
 In Alliance Ware, 92 NLRB at 55-56, the union stationed a sound truck across the street from the employer's parking lot, about 310 feet from the employees' entrance to the plant, where it could be heard by a substantial percentage of eligible voters. The polling place was located 30 feet inside the entrance. The union broadcast electioneering material for about five and one-half hours on election day and continued despite a request by a Board agent to stop. It could not be determined whether the door to the employees' entrance was open or closed, whether the broadcasting could be heard in the polling place and whether employees had to stand outside the entrance when waiting in line to vote. The Board held that the circumstances justified voiding the election.
 
 
 25
 In Claussen Baking, 134 NLRB at 112, an employee stood near the polls and urged several newly hired employees to vote against the union. The Board found the electioneering attributable to the employer because a manager and a supervisor were standing nearby. This occurred within 15 feet of the entrance to the polling place and lasted for about 15 minutes of a one-hour voting period. The Board concluded that the electioneering employee's conduct inhibited the exercise of free choice by other employees.
 
 
 26
 In Carroll Contracting, 636 F.2d at 112-13, the court held that even though the electioneering occurred outside the designated polling place, the area where the employees were waiting on line became a part of the polling place. The court concluded that the electioneering was objectionable, relying principally on Milchem.
 
 
 27
 The present case differs in important respects from each of those cases. The disruption from the electioneering in Alliance Ware was significantly greater; the electioneering was loud, since it was broadcast from a sound truck, of lengthy duration, and flouted a Board request to stop. In the present case, the chanting was brief and not as loud, and the employees were not asked to stop.
 
 
 28
 The electioneering in Claussen Baking was more objectionable than the electioneering in the present case since it was carried out by one of the parties. See, e.g., May Dep't Stores Co. v. NLRB, 707 F.2d 430, 432-33 (9th Cir.1983) (party conduct more likely to be disruptive than third party conduct). In addition, the electioneering employee in Claussen Baking was attempting to influence newly hired employees who were more susceptible to pressure. There is no indication in this case that the employees who heard the chanting were newly hired. Finally, the electioneering in Claussen Baking was carried out on a one-to-one basis, a more direct form of persuasion that tends to put greater pressure on the listener. In contrast, the chanting here was directed at a group of employees rather than at individuals.
 
 
 29
 The Fifth Circuit's decision in Carroll Contracting is also inapposite. The court applied the Milchem rule because the electioneering was directed at employees waiting on line to vote. However, the Fifth Circuit itself has held that Carroll Contracting is not controlling where electioneering is not directed at voters waiting in line. See Boston Insulated Wire & Cable Systems, Inc. v. NLRB, 703 F.2d 876, 882 (5th Cir.1983). In the present case, the employees who heard the chanting were not waiting in line to vote and the chanting did not occur in an area designated a "no electioneering" area. We have previously held that "it would be inappropriate for this court to extend the metes and bounds of Milchem to cover conversations outside the designated polling area." Newton-New Haven Co., 506 F.2d at 1037.
 
 
 30
 In view of all the circumstances, we cannot say that it was unreasonable for the Board to reject the Company's objection to the chanting. The chanting was not voiced by one of the parties but by a group of employees; it was conducted for two or three brief periods; it was conducted in an area 25 to 30 feet from the polls; it was not directed at employees waiting in line to vote; it was not directed at employees on a one-to-one basis; and it could not be understood inside the polling area. Cf. Northern Telecom, Inc., 250 NLRB 564, 568 (1980). The Board therefore did not act improperly in refusing to set aside the election.
 
 D. Failure of Board Agent to Intervene
 
 31
 The Company contends that the failure of the Board agent to prevent Perez and Caez from talking with employees and to prevent the chanting was "so improper that the integrity of the election process and the laboratory conditions were destroyed." The Company cites Athbro Precision Eng'g Corp., 166 NLRB 966 (1967), enforced, 423 F.2d 573 (1st Cir.1970), and Austill Waxed Paper Co., 169 NLRB 1109 (1968), in support of its position. However, neither case is on point. In Athbro Precision Engineering, 166 NLRB at 966, the Board agent in charge of the election drank a beer with one of the union's representatives during a break in the polling. In Austill Waxed Paper, 169 NLRB at 1109-10, the Board agent left an unsealed ballot box unattended for about two to five minutes. In both cases, the election was set aside. Here, however, the failure of the Board agent to prevent the alleged misconduct did not impugn the integrity of the election. Although it would have been better had the Board agent prevented the challenged conversations and the chanting, the failure of a Board agent to prevent all misconduct does not automatically warrant setting aside an election. Since we have found in this case that any disruption that occurred is insufficient to void the election, and the Board agent's decision to refrain from intervening is not a glaring abuse, see Olson Bodies, 420 F.2d at 1189, the failure of the Board to prevent the alleged misconduct did not impugn the integrity of the election. It was not improper, therefore, for the Board to reject the Company's objection.
 
 
 32
 Other arguments raised by the Company include its claim that since the Board did not properly apply its own rules abuse of discretion is not the appropriate standard of review. The Company has failed to show, however, that the Board decision in this case is contrary to any prior Board decision. In any event, we believe that the Board did not misapply its rules. We have considered the Company's remaining arguments and they do not require further discussion.
 
 
 33
 IV. The Union's Request for Additional Remedies
 
 
 34
 The Union argues that the Company's refusal to bargain is made in bad faith since its objections are unreasonable and thus this court should remand this case to the Board to consider imposing extraordinary remedies in addition to the remedies already provided. The Union requests that the Company be required to mail a copy of the Board's notice to former employees who were employed at the time of the election; to inform employees that they have the right to ask for the presence of a Union representative at any investigative interview held by the Company; and to abide by an interim grievance procedure.
 
 
 35
 The Board enjoys broad discretion in deciding what remedies to impose. Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 198-99, 61 S.Ct. 845, 854, 85 L.Ed. 1271 (1941); NLRB v. Martin A. Gleason, Inc., 534 F.2d 466, 482 (2d Cir.1976). The Board argues that the Company adopted a "technical" refusal to bargain in order to obtain judicial review of the Board order. We agree that there is no inherent bad faith in such a refusal to bargain since it is the procedural means by which to secure judicial review. See Lipman Motors, 451 F.2d at 829. And even though we have rejected the Company's objections on the merits, the objections are not so unreasonable as to show bad faith. Therefore, the Board properly denied the Union's request for additional relief.
 
 
 36
 The Board's cross-petition for enforcement of its order is granted. The petitions of the Company and the Union are denied.
 
 
 
 [1]
 The Company argues that because the conversations were in Spanish, they gave the Union an unfair advantage by creating the appearance that Caez was accepted by the employees, particularly those who spoke Spanish. Later in its brief, the Company adds that the Board agent, who the Company describes as "apparently Hispanic," did not intervene and thus fostered the impression that the Board was not neutral. We reject these arguments. The fact that the conversations were conducted in Spanish does not add any weight to the Company's contention that the conversations distracted the employees. This case is no different from a case where the conversations were in English but the content unknown. There is also no reason to doubt the Board agent's neutrality