**UNDERWRITERS LABORATORIES INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**UNDERWRITERS LABORATORIES INC., Respondent.**

Nos. 97–70646, 97–70841.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 13, 1998.

Decided June 22, 1998.

Allen J. Gross, Mitchell, Silberberg & Knupp, Los Angeles, California, for the petitioner-cross-respondent.

James S. Scott & A. Donald Rhoads, National Labor Relations Board, Oakland, California; Aileen A. Armstrong, Office of the General Counsel, National Labor Relations Board, Washington, D.C., for the respondent-cross-petitioner.

Before: FLETCHER, BEEZER and D.W. NELSON, Circuit Judges.

D.W. NELSON, Circuit Judge.

Underwriters Laboratories Incorporated ("UL") petitions for review of an order of the National Labor Relations Board ("NLRB") finding that UL violated Sections 8(a)(1) and (5) of the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 158(a)(1) & (5), by refusing to recognize and bargain with the International Union of Operating Engineers, Stationary Local No. 39, AFL–CIO (the "Union"), which has been certified by the NLRB as the exclusive collective-bargaining representative of a certain unit of UL employees. UL maintains that the NLRB's certification of the Union is unenforceable due to the Union's threatening and coercive conduct prior to the Union's certification election. We have jurisdiction pursuant to 29 U.S.C. § 160(f), and we deny UL's petition for review of the NLRB's decision.

## FACTUAL AND PROCEDURAL BACKGROUND

In August 1992, the Union filed a petition with the NLRB seeking to represent a unit of UL employees. On October 29, 1992, the NLRB held a secret ballot certification election, which the Union won by a vote of 6–4. On November 4, 1992, UL filed timely objections to the election alleging that at a breakfast meeting held two days before the election, Union officials told UL employees who were eligible to vote in the election "that if they did not vote for the union, they would lose their jobs." In support of its objections, UL submitted statements from UL employ-ees Karen Raynor and Phil Menacho, both of whom attended the meeting, and from Richard Horton, the UL manager to whom Raynor and Menacho reported the alleged threat.

After conducting an investigation, but without holding an evidentiary hearing, the Regional Director of the NLRB issued a Report and Recommendation on Objections in which he advised that UL's election objections be overruled in their entirety. UL subsequently filed Exceptions to the Regional Director's Report and Recommendation on Objections. In February 1993, after reviewing the record in light of UL's Exceptions, the NLRB issued a Decision and Certification of Representative, adopting the Regional Director's findings and recommendations and certifying the Union as the exclusive collective-bargaining representative of the unit employees.

In May 1993, General Counsel for the NLRB filed a complaint with the NLRB alleging that UL "has failed and refused to recognize and bargain with the Union as the exclusive collective-bargaining representative of the Unit" in violation of Sections 8(a)(1) and (5) of the NLRA, 29 U.S.C. §§ 158(a)(1) & (5). In its answer to the complaint, UL admitted its refusal to bargain, claiming that it had "no legal duty to recognize and bargain with the Union" because the NLRB's "certification of the Union was unlawful and unenforceable as a result of the Union's threats and coercive conduct."

General Counsel for the NLRB subsequently filed a motion for summary judgment, which was granted in September 1993. The NLRB found that UL had violated Sections 8(a)(1) and (5) of the NLRA, as alleged in the NLRB's complaint, and ordered that UL cease and desist from refusing to bargain with the Union.

UL then petitioned this court for review of the NLRB's order, and the NLRB filed a cross-petition for enforcement of its order. We issued an unpublished decision granting UL's petition for review and remanding the case for an evidentiary hearing. *Underwriters Labs., Inc. v. NLRB*, Nos. 93–70862, 93–70927, 1995 WL 502890, 65 F.3d 176 (9th Cir. Aug. 24, 1995) (*"Underwriters Labs. I"*). At the evidentiary hearing, an administrative law judge ("ALJ") heard testimony from the critical witnesses. Based on the evidence adduced at the hearing, the ALJ found that

UL had violated Sections 8(a)(1) and (5) of the NLRA. The NLRB adopted the ALJ's findings in their entirety and issued a final order requiring that UL cease and desist from refusing to bargain with the Union. UL now petitions for review of the NLRB's order, and the NLRB cross-petitions for enforcement of its order.

## STANDARD OF REVIEW

 We uphold decisions of the NLRB if its findings of fact are supported by substantial evidence and if the NLRB correctly applied the law. *Retlaw Broad. Co. v. NLRB*, 53 F.3d 1002, 1005 (9th Cir.1995). "The ALJ's credibility findings are entitled to special deference and may only be rejected when a clear preponderance of the evidence shows that they are incorrect." *Walnut Creek Honda Assocs. 2, Inc. v. NLRB*, 89 F.3d 645, 648 (9th Cir.1996).

## DISCUSSION

I. *The Legal Framework*

 The NLRB has wide discretion in supervising union elections and in certifying the successful union. *May Dep't Stores Co. v. NLRB*, 707 F.2d 430, 432 (9th Cir.1983). In general, union elections are invalidated only if the alleged conduct "is coercive and has a tendency to affect or interfere with the employees' actions at the polls." *Id.* at 434 (internal quotations and citations omitted). In determining whether a union's conduct was coercive and jeopardized voting employees' free choice, we draw an important distinction between alleged threats directed at all unit employees and those specifically targeted to unit employees who have shown support for the union. Two key cases illustrate the critical difference between these two factual scenarios: *Janler Plastic Mold Corp.*, 186 NLRB 540 (1970), and *NLRB v. Valley Bakery, Inc.*, 1 F.3d 769 (9th Cir. 1993).

Janler Plastic Mold Corp. stands for the central proposition that if an employer had no way of discovering how its employees voted in the union election, threats by the union directed at all voting employees indicating that there would be repercussions if the union lost the election must be deemed illogical and noncoercive. After all, an employer would have no reason for firing a group of employees who voted against the union. The facts of *Janler* are similar to those in the case at bar: A secret ballot election was held, which the union won by a small margin (21–20). 186 NLRB at 540. The employer filed timely objections to the election results, arguing that the union had threatened "that employees would lose their jobs if they did not vote" for the union. *Id.* After concluding that there was no reason for any employee to believe that the employer could ascertain how he or she voted, the NLRB overruled the employer's objections, certified the union, and denied the employer's request for an evidentiary hearing. *Id.* The NLRB explained that because the employer logically would not be "disposed to discharge any employees for voting *against* [the union]," "the employees could reasonably be expected to evaluate these remarks as noncoercive and not as threats." *Id.*

In *Valley Bakery*, in contrast, the alleged threats of job loss were specifically directed at those employees who had demonstrated support for the union by signing union authorization cards. 1 F.3d at 772. The *Valley Bakery* court distinguished *Janler* because of this critical difference. *Id.* at 773. The *Valley Bakery* court also determined that, unlike in *Janler*, the employees might have reason to believe that the employer could discover who had signed the cards. *Id.* Based on circumstantial evidence that implied threats had been made that union supporters would be fired in the event that the union lost the election, the *Valley Bakery* court held that the NLRB had abused its discretion by refusing to hold an evidentiary hearing. *Id.* at 774.

In *Underwriters Labs. I*, relying on *Valley Bakery*, we held that UL was entitled to an evidentiary hearing because UL had made a prima facie showing that the Union had made statements prior to the election that "at the very least strongly implied that if the Union lost the election, Underwriters would fire the employees who had shown the Union some support." 1995 WL 502890, at *1. As in *Valley Bakery*, the *Underwriters Labs. I* court remanded the case for an evidentiary hearing to consider the factual circumstances surrounding the alleged misconduct in greater depth. *Id.* at *2.

Three UL employees, who had attended the critical October 1992 breakfast meeting, testified as to what had been said. The ALJ found that the statement made by the Union official at the meeting was "directed toward all employees." The ALJ further found that the statement made "no reference to authorization cards nor was it made in the context of a discussion as to authorization cards." The ALJ concluded that *Janler* governed this case because of the similarity of the facts. The ALJ distinguished *Valley Bakery* because there "the threat was directed toward those who had aided the Union's cause."

UL contends, however, that even if we decide that the alleged threat was directed at all voting employees, *Valley Bakery* governs the present case because *Valley Bakery* served as controlling precedent in *Underwriters Labs. I*. This argument is without merit. Although the *Underwriters Labs. I* court found that the case before it was "remarkably like" *Valley Bakery,* 1995 WL 502890, at *1, the question before the *Underwriters Labs. I* court was entirely different from the question before us today. In *Underwriters Labs. I,* as in *Valley Bakery,* the issue was whether the NLRB had abused its discretion in failing to hold an evidentiary hearing on the employer's election objections. The *Underwriters Labs. I* court therefore was only considering whether UL had made a prima facie showing that the Union's threats had interfered with the voting employees' free choice. *See May Dep't Stores Co.,* 707 F.2d at 432 (holding that an evidentiary hearing on election objections must be granted if the objecting party has made "a prima facie showing of substantial material factual issues that would, if true, warrant setting aside the election") (citation omitted). The evidentiary hearing has now been held. The ALJ concluded that the threats were directed not selectively at pro-Union employees, but at the unit employees collectively. Now that the facts have been developed, *Janler,* not *Valley Bakery,* controls the present case.

## II. *Substantial Evidence in the Record as a Whole Supports the ALJ's Findings*

### A. *Evidence prior to the evidentiary hearing*

■ The ALJ did not hold his evidentiary hearing in a vacuum. He was measuring the evidence received in the hearing against the record that had already been made. This informed his findings on credibility as well as his findings on the merits. Even before the evidentiary hearing in this case, there was evidence in the record suggesting that the Union's statement at the breakfast meeting regarding job loss was not directed at pro-Union employees only. As a starting point, a close look at UL's original election objections reveals that the objections describe a threat against the unit employees as a group, not against those employees who aided the Union's cause. UL's objections report the following conduct:

> On or about October 27, 1992, just two days before the election, [the union] held a group breakfast meeting attended by approximately seven [of] the ten eligible voters. At that meeting, Robert Herberger [sic] and/or another individual, both officials of the union, made statements to the employees that if they did not vote for the union, they would lose their jobs.

UL's general reference to "the employees" does not distinguish between those who generally supported the Union and/or signed authorization cards and those who did not.

A sworn statement by Richard C. Horton, UL's Human Resources Manager, provides further evidence that the alleged threat was not directed specifically at employees who had supported the Union's cause. Horton wrote that Karen Raynor, a UL employee, had informed him that "the union representative said that despite what the company may have told the voting unit members, if they voted against the union they would lose their jobs." Horton's statement appears to refer to the voting unit members as a group.

### B. *Testimony at the evidentiary hearing*

The ALJ's findings are consistent with the inferences that can be drawn from UL's objections and Horton's statement. The first witness to testify at the ALJ hearing was Karen Raynor, one of two UL employees who reported the alleged threat immediately after the breakfast meeting held by the Union. Raynor's statement read: "At that meeting, a union representative stated that despite what the company may have told us,

if we vote no, we will lose our jobs." At the hearing, however, her account of the alleged threat was significantly different: "The Union representative said that if the Union did not get into UL, that UL knew who had signed the cards for the Union, and that they could probably fire people that had voted for the Union." When asked on cross-examination why her original statement did not reflect that she had been told that UL knew who had signed the authorization cards, Raynor responded, "When I was asked to give a statement, I wasn't giving a dissertation." The ALJ discredited Raynor's altered account of the meeting, explaining that it seemed she was "attempting to testify in a manner most favorable to [UL]."

The second witness to testify at the hearing, Phil Menacho, was also found unreliable by the ALJ due to changes and inconsistencies in his narration of the breakfast meeting. Menacho originally gave the following statement: "At the meeting, while discussing signing authorization cards, a union representative stated something to the effect that if the employees voted the union out, the company would find ways to get rid of us." In keeping with Raynor's written statement, Menacho's statement did not indicate that the alleged threats were directed against employees who supported the Union or had signed the cards. Rather, Menacho's statement referred to the UL "employees," or "us," as a cohesive group. Like Raynor, however, Menacho offered a different version of the breakfast meeting at the ALJ hearing. There, he stated that at the meeting "one of the Union officials said that ... the company knew who had and hadn't signed cards .... [a]nd that if the Union lost the election ... the company would find a way to get rid of them." When cross-examined on the discrepancy between his original statement and his hearing testimony, Menacho was hesitant and noncommittal about whether the threats were directed at all unit employees or at card-signers only.

■ We defer to the ALJ's determination that Raynor and Menacho were not credible witnesses. In evaluating Raynor and Menacho's testimony, the ALJ found that "[b]ased on their demeanor and the shifting nature of their testimony," the two witnesses were not "particularly reliable." This court has made clear that "[c]redibility determinations by the ALJ are given great deference, and are upheld unless they are inherently incredible or patently unreasonable." *Retlaw Broad. Co.*, 53 F.3d at 1006 (internal quotations and citations omitted); *see also Walnut Creek Honda Assocs. 2, Inc.*, 89 F.3d at 648 ("The ALJ's credibility findings are entitled to special deference and may only be rejected when a clear preponderance of the evidence shows that they are incorrect."). Here, the ALJ's credibility findings are supported by reasons based on discrepancies and shifts in the witnesses' testimony during the course of examination, and by a comparison between the witnesses' original sworn statements and their accounts of the same events during the evidentiary hearing. Judging from the record, Menacho seems to have been an especially unreliable witness not only because he changed his story repeatedly, as described above, but also because he was unable to recall key pieces of information: He could not remember which Union representative made the alleged threat, how the discussion of authorization cards "came about," or the "exact words" of the alleged threat.

■ The third and final witness to testify at the hearing, LaVerne Breece, was present at the breakfast meeting but, unlike Raynor and Menacho, did not report the alleged threat to Richard Horton. Breece could not recall the "exact words" of the alleged threat, but did remember that a Union representative had stated "that there could be repercussions against the people that were trying to get the Union in to Underwriters." Breece, however, did not "recall any conversation or words about authorization cards" at the time during the meeting. Finding Breece "to be an honest, forthright witness, who readily admitted that he does not recall what was actually said," the ALJ credited Breece's testimony regarding the authorization cards but not his testimony about "repercussions" against Union supporters since he did not remember exactly what was said.

We have recently held that "the ALJ could reasonably find some parts of [a witness's] testimony believable and other parts unbelievable." *New Breed Leasing Corp. v. NLRB*, 111 F.3d 1460, 1465 (9th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 366, 139 L.Ed.2d 285 (1997). Other circuits, too, have

noted in the labor context that the trier of fact "need not treat the testimony of each witness as indivisible, for acceptance or rejection only as a unit." *NLRB v. Downslope Indus., Inc.*, 676 F.2d 1114, 1116 (6th Cir. 1982); *see also Rockwell Int'l Corp. v. NLRB*, 814 F.2d 1530, 1532 n. 2 (11th Cir. 1987) (maintaining that the ALJ "is free to believe some testimony, without believing the witness' whole story"). In light of Breece's own admission that his recollection of what transpired at the breakfast meeting was somewhat hazy, we do not find the ALJ's credibility determination "patently unreasonable." *Retlaw Broad. Co.*, 53 F.3d at 1006.

### C. The ALJ's failure to draw an adverse inference

 Next, UL argues that the ALJ should have drawn an adverse inference from the Union's failure to call Robert Herbruger, the Union official whose statement was at the heart of the controversy. "[W]hen a party fails to call a witness who may reasonably be assumed to be favorably disposed to the party, an adverse inference may be drawn regarding any factual question on which the witness is likely to have knowledge." *International Automated Machs., Inc.*, 285 NLRB 1122, 1123 (1987) (citing 2 Wigmore, Evidence § 286 (2d ed.1940); McCormick, Evidence § 272 (3d ed.1984)). The words "*may be drawn*" are the key. The decision to draw an adverse inference lies within the sound discretion of the trier of fact. We have never suggested that the NLRB is required to draw an adverse inference against a party that fails to call a certain witness. In addressing this precise issue in a case involving a similar set of facts, the Tenth Circuit reasoned:

> [The company] would expand the adverse inference rule to require that the failure to call [a certain witness] obligates the Board to resolve all issues with respect to which he may have testified against the union. We do not believe that the rule reaches that far. The rule permits an adverse inference to be drawn; it does not create a conclusive presumption against the party failing to call the witness.

*Rockingham Machine–Lunex Co. v. NLRB*, 665 F.2d 303, 305 (8th Cir.1981); *see also Overnite Transp. Co. v. NLRB*, 140 F.3d 259,

266–67 n. 1 (D.C.Cir. 1998) ("[T]he decision of whether to draw an adverse inference has generally been held to be within the discretion of the fact finder."). We agree.

Here, Herbruger was present in the hearing room. The ALJ's decision not to draw an adverse inference is thus supported by the fact that UL was at liberty to call Herbruger itself. It was actually possible for the ALJ to have drawn an inference adverse to UL from its failure to call Herbruger to the stand. *See NLRB v. Massachusetts Mach. & Stamping, Inc.*, 578 F.2d 15, 20 (1st Cir. 1978) ("[I]f we were to adopt the Company's reasoning, it would be as logical to draw an inference adverse to the Company for its failure to call the missing witness as to invoke the inference against the Board."). In view of this possibility, the ALJ certainly did not abuse his discretion in deciding not to draw an adverse inference against the Union for not calling Herbruger to testify.

### CONCLUSION

In sum, we find that substantial evidence in the record supports the NLRB's determination that the facts of this case are analogous to those in *Janler Plastic Mold Corp.*, 186 NLRB 540 (1970). UL's petition for review is DENIED, and the NLRB's cross-petition for enforcement is GRANTED.