## Gaspari, Appellant, *v.* Muhlenberg Township Board of Adjustment.

8

Argued January 8, 1958. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, JONES and COHEN, JJ.

*George B. Balmer,* with him *Harry W. Speidel, Raymond C. Schlegel,* and *Snyder, Balmer & Kershner,* for appellants.

*Joseph E. DeSantis,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, March 17, 1958:

Prior to recent years, commercially grown mushrooms obtained most of their substance, but fortunately, not their flavor, from horse manure. Professor Leon Russell Kneebone of the Pennsylvania State University, who has charge of the Mushroom Experimental Station at that university, testified in this case: ". . . The Mushroom is a plant but it is not a plant like a green plant which needs only sun, light, water, carbon dioxide from the air; the mushroom would never

be able to grow. The mushroom must be fed more like an animal is fed because it cannot make its own food. It must be fed special. The compost is that kind of material. The traditional method was horse manure."

With the advent of the motor age which brought in its train the disbandment of the cavalry by the United States Army, the abandonment in most cities of mounted police, the emancipation of brewery wagon percherons, and the general substitution of gasoline as fuel for vehicles theretofore horse-drawn, it was only natural that considerably less horse manure was produced. As a consequence, the mushroom industry faced a crisis. Thus, do many seemingly unrelated subjects bear heavily upon the fate of one another.

However, science came to the rescue with the invention or development of an artificial manure which has become known as synthetic compost. This object of man's fertile ingenuity seems to fulfill all the requirements of alimentation and agricultural growth associated with horse manure, that is, insofar as mushrooms are concerned, and it has, therefore, practically supplanted the earthier product. In fact, one of the plaintiffs here, Anthony Gaspari, testified that he would not use horse manure if he could get it for nothing.

Arthur Gaspari and his two brothers, Pietro and Gino, own 17 acres of land south of Frush Valley Road in Muhlenberg Township, Berks County. Since 1929 the Gaspari land has been utilized for the growing of mushrooms for sale. Beginning with 1933 the Gasparis have also engaged in the sale of mushroom supplies as mushroom paper, mushroom wire, baskets, manure baskets, wash tubs of all sizes, ground tubs, electric cords, insecticides and fungicides, thermometers and different types of hoses and spraying nozzles.

From 1936 to 1951 the Gasparis produced for sale mushroom spawn. (Mushroom spawn is the medium from which mushrooms grow).*

In 1948 the shadow of a manure famine began to fall over the Gaspari land. It seems that not only was horse manure gradually disappearing, because of the increased elimination of the producers, but what manure was available had considerably decreased in quality. While the scarcity, of course, was explained, no witness testified as to why the manure had deteriorated in tone to such an extent that the mushrooms depending on it for sustenance failed to achieve the stature of marketability. Thus it was that in 1949 the Gasparis turned to science for manure. They succeeded beyond their most effluvial aspirations. They succeeded in producing a synthetic manure of such fertility and salubrity that, as already indicated, the plaintiff A. Gaspari would not today exchange his synthetic manure for horse manure if he could get horse manure gratis. But trouble of another odor was brewing for A. Gaspari and his brothers.

On August 26, 1955, the Building Inspector of Muhlenberg Township ordered the Gasparis to cease and desist in the production of synthetic manure and to dispose in 20 days of "all stock of manure not required for your own immediate use." The Gasparis appealed to the Board of Adjustment. The Board heard the appeal on October 10, 1955; and on November 18, 1955, affirmed the inspector's order. Further hearings were held on January 23, 1956 and October 23, 1956, but the ban remained unchanged. The matter was then heard in the Court of Common Pleas of Berks County which affirmed the decision of the Board of Adjustment. The appeal to this Court followed.

---

* Anthony Gaspari described mushroom spawn as follows: "In comparing it to a plant, it would be the starting of the seed."

The Gaspari property is located in an area known as "F" Farm District, according to an ordinance of the Township of Muhlenberg enacted June 8, 1943. Articles 2 and 3 of this ordinance permit: "3. Farming in all its branches, including the erection or alteration of the usual accessory farm buildings incident to agriculture and animal husbandry. 4. Marketing or processing of farm products, where such use is accessory and incidental to the raising of said products."

It is the legal position of Muhlenberg Township that the production of synthetic compost is not farming but manufacturing and that, therefore, being prohibited by ordinance, the order of the lower Court should be affirmed. The Gasparis argue, on the other hand, that the lower Court's order should be reversed on two grounds: (1) that the production of the artificial compost is an agricultural activity and therefore comes within the ambit of the authorized "farming in all its branches; (2) that the activity in question is a valid extension of a nonconforming use.

What are the ingredients which go into the making of compost and what is the process whereby those ingredients become compost? The ingredients are simply hay and crushed corn cobs which are mixed and airated, and treated with cyanamid, potash and gypsum. The completed operation usually takes 15 days, during which time the accumulations are moved approximately every three days. The lower Court says in its opinion: "If the component parts of the synthetic compost were mixed and then used as a medium for the growing of mushrooms, the growing medium would be ineffective. The ingredients must be thoroughly mixed, water must be applied together with a prescribed chemical, and the resulting mass periodically turned mechanically so that a bacteriological change may take place. After the change has taken place, the end prod-

uct is a synthetic manure or compost which is an effective growing medium." After this exposition it arrives at the conclusion that synthetic manure is achieved via a manufacturing process. It calls upon the language in our decision of *Commonwealth v. Weiland Packing Co.*, 292 Pa. 441-451 to support this conclusion: ". . . the process of manufacture brings about the production of some new article by the application of skill and labor to the original substance or material out of which such new product emerges. If, however, there is merely a superficial change in the original materials or substances and no substantial and well signalized transformation in form, qualities and adaptability in use, quite different from the originals, it cannot properly and with reason be held that a new article or object has emerged,—a new production been created."

But here, it is not a question as to whether one is or is not producing a new article. The tomato which finally hangs on the plant is quite a new article when compared to the tiny seed which went into the ground. The oak tree is certainly a new article when compared to the acorn from which it sprang. The newness must come about through the application of skill and labor, entirely or mostly apart from what is done by Nature herself. Thus, we properly and logically held in *Commonwealth v. McGrady-Rodgers Co.*, 316 Pa. 155, a case also cited by the lower Court, that production of concrete is manufacturing. The metamorphosis of sand, gravel and cement into pavement is exclusively a mechanical process under the domination and control of man. The production of synthetic compost is something entirely different.

Professor Kneebone of Pennsylvania State University, an acknowledged expert on the subject, testified that the making of synthetic compost "is an agricul-

tural enterprise." He amplified: "You are preparing a material in which you expect to grow. The operation is just as much agricultural as the tilling of the farmer's field. He is attempting to prepare his fields in order to grow certain plants. The mushroom will not grow in a field but it does grow in compost. Therefore, it seems that the preparation of a compost is necessary; it is the medium in which you will grow your plant."

No one was called by the Board of Adjustment or by the protestants to contradict Professor Kneebone's definition of synthetic compost.

The case of *Commonwealth v. Lowry-Rodgers Co.*, 279 Pa. 361, offers an interesting exposition on the subject of what constitutes manufacturing under the mercantile tax laws of the State. In that case it was contended that the roasting of green coffee beans was a manufacturing process because ". . . roasting the bean changes its color and chemical composition, decreases its weight by the expulsion of moisture, and enlarges its size and modifies its form, when it 'cracks and pops, like popcorn.'" After citing various cases, this Court said: "In each of these cases the change in 'form and condition' was entirely physical, and appellant seeks, therefore, to distinguish them from the instant case, because in roasting coffee there is also a chemical change. If this supposed distinction furnished the test, then frying eggs, baking potatoes, stewing tomatoes, etc., etc., would be manufacturing, for the application of heat to them requires skill, and effects a chemical change also; this is probably as much so in the first of these instances as is the case in roasting coffee. In each and all of these matters, 'in the popular, and therefore in the statutory, sense of the word,' it is probable that few, if any, people would say that the process of cooking is in fact manufacturing . . ." Con-

cluding that the roasting of coffee beans was not manufacturing, we declared: "Having regard thereto and to the purpose of the exemption, we have no hesitancy in saying that it does not cover the case of merely cleaning and effecting a chemical change in a natural product, however skilful and beneficial the process and its result may be, even though there also occurs an incidental change in the size, form and weight of that product."

In *Rieck-McJunkin Dairy Co. v. Pittsburgh School District*, 362 Pa. 13, it was argued that the pasteurization and homogenization of milk was a manufacturing process, it being particularly pointed out that machinery was utilized in the procedure. We held to the opposite effect: "Pasteurization involves heating milk to a certain temperature and holding it at that temperature for a specified length of time for the purpose of destroying disease producing organisms. The process results in changes in its protein and mineral content. The mere fact that plaintiffs do this on a large scale with expensive machinery does not make it any the less processing milk. . . . Homogenization breaks up globules of fat to prevent separation of cream from milk and results in uniform distribution of the fat content of the milk. Milk is homogenized by forcing it through small openings at pressures from 2500 to 4000 pounds per square inch. While some of the attributes of milk are changed by the process it is not manufacturing into a new and different article."

An article which comes into being through human and mechanical manipulation of raw materials which in themselves are not active partners in the transforming and creative process can be said to be a manufactured article.

In the process under discussion the hay and corn cobs participate in the chemical and biological changes

when water is poured over them and they are mixed, turned, and moved in the open air. And, as the photographs introduced in evidence reveal, the hay and corn cobs, at the termination of the process, have not emerged as distinctly new articles. They are readily recognizable even in the final stage of the operation.

The Muhlenberg Board of Adjustment looked at the issue before it through narrowing glasses. In its supplemental decision filed Feb. 13, 1956, it referred to the creation of mushroom spawn as a manufacturing process. In four different findings of fact it spoke of the "manufacture of spawn." The slightest knowledge of agriculture and the most exaggerated view of manufacture should still reveal that the growing of spawn in horse manure is not manufacture. The Court of Common Pleas of Berks County disagreed with these findings of fact and well said: "We cannot conceive of this activity as being a manufacturing procedure. To us it parallels the case of an orchardist who plants and cultivates fruit trees of various kinds and, after they have attained a certain maturity, sells them to fruit growers; or the grower of tobacco plants, who sets out the seed in specially prepared beds and later removes the growing slips for planting in his own fields, or sells them to other farmers. No one would contend that the individuals mentioned in the examples suggested are engaged in manufacturing . . ." However, after correcting the Board's findings in this respect it did not alter the decision because it said: ". . . the ultimate result is not affected for the board has also found that appellants' prior activities '. . . are not encompassed within the definition of prior nonconforming uses under Article IX of the Zoning Ordinance of Muhlenberg Township.'"

It was not necessary for the Court of Common Pleas to consider, nor is it necessary for us, whether the pro-

duction of synthetic compost was a valid extension of a nonconforming use because the activity never entered into the category of a nonconforming use, coming, as it did, well within the ambit of "farming in all its branches."

Reversed.

Mr. Justice COHEN dissents.