**KAOLIN MUSHROOM FARMS, INC., Petitioner,**

v.

**PENNSYLVANIA LABOR RELATIONS BOARD, Respondent.**

Commonwealth Court of Pennsylvania.

Argued May 5, 1997.
Decided Nov. 10, 1997.

Brian F. Jackson, Harrisburg, for petitioner.

Peter Lassi, Harrisburg, for respondent.

Arthur N. Read and Samuel L. Spear, Philadelphia, for intervenor, Kaolin Worker's Union.

Before DOYLE and PELLEGRINI, JJ., and MIRARCHI, Jr., Senior Judge.

DOYLE, Judge.

Kaolin Mushroom Farms, Inc. (Kaolin) appeals from an order of the Pennsylvania Labor Relations Board (PLRB or Board) certifying the Union de Trabajadores de Kaolin, also known as the Kaolin Workers' Union (Union), as the exclusive bargaining representative for certain employees of Kaolin and dismissing Kaolin's post-election objections to the representation election held on May 27, 1993.

Kaolin is a Pennsylvania corporation that is engaged in the production and harvesting of mushrooms, with its principal place of business in Kennett Square, Pennsylvania. Kaolin owns and operates three mushroom farms in the Chester County, Kennett Square area, and a great number of its employees are "migrant farm workers." These employees vary in ethnic background from Hispanic to Vietnamese to Cambodian, and a large percentage of Kaolin's employees are of Hispanic origin and speak only Spanish.

## I. FACTUAL AND PROCEDURAL HISTORY

On April 6, 1993, Kaolin filed an unfair labor practice charge with the Board in which it alleged that the Comité de Apoyo a los Trabajadores Agrícolas (CATA) [1] committed unfair labor practices in violation of Sections 6(2)(a), (b) and (e) of the Pennsylvania Labor Relations Act (PLRA).[2] On April 16,

---

1. Translated into English, CATA is an acronym for the Farmworkers Support Committee. CATA. is a nonprofit corporation with its headquarters in Glassboro, New Jersey. One of CATA's principal purposes and functions, as defined in its articles of incorporation, is to assist farmworkers to obtain more favorable working conditions and to help farmworkers resolve problems at the workplace.

2. Act of June 1, 1937, P.L. 1168, *as amended*, 43 P.S. § 211.6(2)(a)–(c), (e). Specifically, Kaolin alleged, *inter alia*, that CATA, by its officers and agents, engaged in acts of trespass, violence, threats, intimidation and destruction of private property in violation of the PLRA. Kaolin further alleged that these acts were performed in connection with a labor strike which began on April 1, 1993, and that they were intended to coerce the employees of Kaolin to select the Union as

1993, the Board issued a complaint and notice of hearing on the charge and scheduled a hearing for May 21, 1993.

On May 3, 1993, two representatives and members of the Union filed a Petition for Representation with the Board, seeking to represent certain full-time and regular part-time workers employed by Kaolin. On May 11, 1993, the Union also submitted a request filed pursuant to Section 7(c) of the PLRA, 43 P.S. § 211.7(c), that an expedited election occur within twenty days.

On May 21, 1993, the Board ordered and directed that an election by secret ballot occur on Thursday, May 27, 1993. The Board's Order and Notice of Election further provided that the election would be held in three phases: from 4:00 a.m. to 6:30 a.m. at Kaolin's Alpine farm in Landenberg; from 7:15 a.m. to 12:30 p.m. at the utility shed at Kaolin's facility in Kennett Square; and from 3:00 p.m. to 6:00 p.m. in the cafeteria at the Kennett Square facility. The Board's Order and Notice of Election included sample ballots printed in English, Spanish, Vietnamese and Khmer,[3] and Kaolin duly produced and posted the order, notice and ballots as required by the Board.

The representation election was conducted on May 27, 1993, by two Board election officials, Theresa McGeehan and Timothy Tietze. Two hundred sixty-three (263) individuals cast ballots in the election, with one hundred twenty-four (124) cast in favor of union representation, one hundred one (101) votes cast for "No Representative," and thirty-eight (38) votes initially challenged and uncounted.

Following the election, the parties entered into a stipulation of facts with respect to PLRB jurisdiction and the challenged ballots.[4] Subsequently, on July 6, 1993, the hearing examiner issued an order styled as "Order Determining Appropriateness of Unit and Providing for Canvassing and Counting of Impounded and Certain Challenged Ballots." Pursuant to this order, seven of the thirty-eight challenged ballots were resolved, six of which were cast for the Union and one which was cast for "No Representative."

On July 20, 1993, Kaolin filed and served objections to the election and subsequently filed and served amended post-election objections on July 22, 1993. Before the Board, the objections upon which Kaolin's challenge to the election was based included the following: unremedied unfair labor practices committed by CATA which formed the basis of the charges filed by Kaolin on April 8, 1993; the fact that "Kaolin's observers noticed on several occasions two or more persons occupying the balloting area"; the inefficacy of the Spanish interpreter present during the election; the thirty to forty-five minute delay in the commencement of voting at the Kennett Square facility;[5] and the presence of

their exclusive collective bargaining representative.

3. Khmer is the official language of Cambodia.

4. The Board's jurisdiction over the employees at issue in this case has not been challenged by either party. We note, however, that, because most mushroom workers are considered to be performing "agricultural labor," under federal labor law they are not covered by the National Labor Relations Act (NLRA), which specifically excludes agricultural laborers from the definition of "employees" covered by the NLRA. See 29 U.S.C. § 152(3). Because the PLRA defines "employees" in substantially the same way as the NLRA, 43 P.S. § 211.3 ("the term 'employe' ... shall not include any individual employed as an agricultural laborer"), a valid argument may exist regarding whether the PLRA also excludes from the scope of its coverage the mushroom workers involved in this appeal. Our determination not to address this issue reflects the fact that it has not been raised as an issue by either party

on appeal, and, therefore, this opinion should not be interpreted as in any way resolving that issue. See, e.g., Kaolin Mushroom Farms, Inc. v. United States, No. 77–4379, 1979 U.S. Dist. LEXIS 9649 (E.D.Pa. Sept. 21, 1979); Giorgi v. Pennsylvania Labor Relations Board, 293 F.Supp. 873 (E.D.Pa. 1968); Gaspari v. Board of Adjustment of Township of Muhlenberg, 392 Pa. 7, 139 A.2d 544 (1958).

5. In its Amended Post–Election Objections submitted to the Board, Kaolin described the alleged consequences of this delay as follows:

25. To promote an orderly election and to minimize interference from other workers, Kaolin had arranged for pickers employed at the Kennett facility to vote while on their shift, between 7:15 a.m. and 10:30 a.m.

26. As a result of the significant delays caused by the PLRB's errors at the Alpine and Kennett facility, the voting was not completed among the pickers at the Kennett facility until

the press around the polling area. (Amended Post–Election Objections; R.R. at 45–64.) Kaolin requested that, on the basis of these objections, the Board set aside the previous election and direct and order a new representation election.

The Board held hearings between August 9, 1993, and June 2, 1994, during the course of which the unfair labor practice charges, filed by Kaolin against CATA on April 6, 1993, were consolidated with Kaolin's post-election objections. The hearing examiner issued a Proposed Decision and Order on April 5, 1995, in which he addressed the unfair labor practice charges filed against CATA and found, *inter alia,* that CATA had a complete defense pursuant to Section 10 of the Act [6] because Kaolin had also engaged in unfair labor practices.[7] However, the hearing examiner, although dismissing the majority of Kaolin's post-election objections, sustained Kaolin's objections relating to the inadequacy of the Spanish interpreter present during the election (discussed below) and

ultimately concluded that the election should be set aside.

The remaining challenged ballots were opened, canvassed and counted on March 8, 1996, and, on March 12, 1996, the Board issued an Order Directing Remand to Board Representative in which it found as a fact that the final tally of ballots cast in the election was 140 ballots cast in favor of the Union, 102 ballots cast for "No Representative," and one remaining challenged ballot.[8] The Board amended the hearing examiner's Proposed Decision and Order by setting forth "amended and additional findings of fact" in its Order Directing Remand to Board Representative and declined to set aside the election, reasoning that Kaolin failed to establish that the alleged improper conduct affected enough votes to have an impact on the outcome of the election.

■ On March 22, 1996, the Board issued a Nisi Order of Certification in which the Board certified the Union as the exclusive bargaining representative of Kaolin's mushroom laborers.[9] On June 11, 1996, the Board

---

long after the work shift among pickers at the Kennett facility had ended.

27. Once the shift had ended, a large number of pickers who were believed to be union supporters converged in and near the voting area without authorization and proceeded to shout threats to and otherwise coerce those workers they perceived as being 'pro-company.' Had the election been conducted in a timely and proper manner as planned, this serious problem would not have occurred. Due to the activities of union supporters, on information and belief, workers left the Kaolin site without voting, and those that voted were coerced likely influencing the direction of their vote.

(Amended Post–Election Objections at 8–9; Reproduced Record (R.R.) at 62–63.)

6. 43 P.S. § 211.10.1. This section provides as follows:

Whenever the board shall find, as part of its findings of fact in any proceeding before it, that the party or parties filing charges of unfair labor practices upon which the complaint was based have engaged in an unfair labor practice (as defined in section six) in connection with or as part of the actions forming the basis of the complaint, such findings shall constitute a complete defense to the complaint, and no order shall issue thereon against the person charged.

*Id.* (footnote omitted).

7. Although the Board's decision concerning the alleged unfair labor practices allegedly commit-

ted by CATA is not now before us on appeal, Kaolin contends that the conduct forming the basis of these charges nevertheless had a material impact on the representation election. Specifically, Kaolin asserts in its Petition for Review that:

The Board erred and acted improperly when it determined that its previous ruling that CATA had established a valid defense to unfair labor practices under Section 10.1 of the Pennsylvania Labor Relations Act rendered said unfair labor practices irrelevant for purposes of determining whether the election results should be set aside.

(Petition for Review at 4.)

8. These final figures total only 243 votes, twenty less than the 263 votes originally cast. The reason for this twenty-vote discrepancy is not readily apparent from the voluminous record, but it is presumably related to the resolution of the 38 ballots which were initially challenged.

9. Specifically, the certified bargaining unit consisted of the following employees as stated in the Board's Nisi Order of Certification:

All full-time and regular part-time mushroom production laborers, including but not limited to pickers, casers, spawners and watermen; and excluding office clerical employes, supervisors, managerial employes, over the road truck drivers, the soil division, the compost division, packers, shippers, maintenance shop

issued a Final Order in which it made its prior Nisi Order of Certification final and dismissed Kaolin's post-election exceptions. This appeal ensued.[10]

On appeal, Kaolin argues that the Board erred as a matter of law by refusing to set aside the representation election and order a new election, and by certifying the Union as the exclusive bargaining representative on the basis of what its contends was a "tainted" election. Specifically, Kaolin argues that the Board should have ordered a new election because the following "procedural irregularities" tarnished the "laboratory conditions" necessary for the employees to express their free and fair choice in the election: (1) because the Spanish interpreter appointed by the Board was so incompetent that she was incapable of communicating election procedures to an electorate that understood virtually no English and was "largely illiterate" in both Spanish and English; (2) because certain voters who lacked identification were improperly disenfranchised of their right to vote in the representation election; (3) because the methods employed by the Board to verify the identity of certain voters created the impression that the secrecy of the election was being compromised; (4) because the Board failed to adequately control the polling areas by permitting electioneering, allowing a member of the press to be in the polling area with a camera for approximately twenty seconds, and, in some instances, permitting two voters to be in a voting booth at the same time, resulting in coercion and further compromising the secrecy of the election; and (5) because the election was tainted by certain unfair labor practices committed by CATA seven to eight weeks prior to the election.

## II. ANALYSIS

As an initial matter, we note that Kaolin in its brief places much emphasis on the fact that the hearing examiner ultimately concluded that, "[n]otwithstanding the margin of victory, the provision of an inadequate Spanish interpreter is a serious blow to the laboratory conditions which requires that a new election must be held." (Proposed Decision and Order, 4/5/95, at 100; R.R. at 168.) However, this fact is of little consequence for appellate purposes, because it is the order and findings of **the Board,** and not those of the hearing examiner, which are subject to appellate review by this Court. *See Gioia v. Unemployment Compensation Board of Review,* 661 A.2d 34 (Pa.Cmwlth.1995). As we stated in *Xilas v. Pennsylvania Labor Relations Board,* 65 Pa.Cmwlth. 18, 441 A.2d 513 (1982):

> Section 8(b) of the PLRA, 43 P.S. § 211.8(b), provides that a hearing regarding an unfair labor practice charge be conducted 'before the Board, or any member or designated agent thereof,' and section 8(c), 43 P.S. § 211.8(c) requires that testimony taken at such a hearing be reduced to writing and filed with the Board. Section 8(c) specifically provides that, based upon such testimony, the Board shall determine whether or not an unfair labor practice has been committed and 'shall state its findings of fact.' We believe that this language clearly designates the Board as the ultimate finder of fact with the discretion to evaluate the credibility of the witnesses based upon the testimony in the record. In this regard, the role of the Board as fact finder is similar to that of the Unemployment Compensation Board of Review which is permitted to resolve credibility issues and to make findings without being bound by a referee's disposition of those matters. *See Unemployment Compensation Board of Review v. Wright,*

---

personnel, contracted laborers, and children and spouses of owners.
(Board's Nisi Order of Certification, 3/22/96, at 3.)

10. Our standard of review on appeal from orders of the Board certifying exclusive bargaining representatives is limited to determining whether the Board's findings are supported by substantial and legally credible evidence and whether the Board's conclusions are reasonable and not arbitrary, capricious, or illegal. *American Federation of State, County and Municipal Employees, District Council 33, Local 159 v. Commonwealth,* 118 Pa.Cmwlth. 312, 545 A.2d 426 (1988). Additionally, if the Board's findings are supported by substantial evidence, they are conclusive for purposes of appellate review. *Commonwealth v. Pennsylvania Labor Relations Board,* 502 Pa. 7, 463 A.2d 409 (1983).

21 Pa.Commonwealth Ct. 637, 347 A.2d 328 (1975). **We must, therefore, hold that the Board, not its appointed hearing examiners, has the final authority to determine issues of credibility....**
*Id.* 441 A.2d at 515 (emphasis added). Consequently, we cannot give the hearing examiner's decision or findings of fact the weight or import suggested by Kaolin in its brief.

■ Although Kaolin contends in its brief that the Board's failure to maintain perfect laboratory conditions necessitates a new election, it is a well-settled principle of labor law that the theoretical concept of laboratory conditions must be realistically applied. *See, e.g., Amalgamated Service & Allied Industries Joint Board, Amalgamated Clothing & Textile Workers Union v. NLRB,* 815 F.2d 225 (2d Cir.1987). As the United States Court of Appeals for the Second Circuit stated in *Amalgamated Service & Allied Industries Joint Board:*

> Throughout its briefs, the Company emphasizes that if the Board fails to maintain "laboratory conditions" for the conduct of an election ... the election must be invalidated. The idea of laboratory conditions is a useful guide for measuring the conduct of an election. However, it is probably not possible to completely achieve such ideal conditions, and elections will not automatically be voided whenever they fall short of that standard. **Rather, the idea of laboratory conditions must be realistically applied.** The Board has broad discretion to determine whether the circumstances of an election come sufficiently close to laboratory conditions so that employees can exercise free choice in deciding whether to select the [u]nion as their representative.

*Id.* at 227 (emphasis added) (citation omitted); *see also NLRB v. Duriron Co.,* 978 F.2d 254, 256 (6th Cir.1992) (" 'Laboratory conditions' are not always achieved in practice, and elections are not automatically voided whenever they fall short of perfection."); *NLRB v. Bayliss Trucking Corp.,* 432 F.2d 1025, 1029 (2d Cir.1970) ("[M]ore than the theoretical possibility of a tainted result must be established before we will overturn the Board's conclusion that the [procedural] irregularity was harmless.").

■ Although Pennsylvania case law relating to the applicable standard for setting aside a representation election is rather sparse, such standards are firmly established as a matter of federal law, and we are thus persuaded to apply the same standards:

> Representation elections are not to be set aside lightly.... The party challenging an election carries a heavy burden: the objecting party must 'show by specific evidence not only that improprieties occurred, but also that they interfered with employees' exercise of free choice to such an extent that they **materially affected** the election results.'

*Millard Processing Services, Inc. v. NLRB,* 2 F.3d 258, 261 (8th Cir.1993) (emphasis added) (citations omitted) (quoting *Beaird–Poulan Division, Emerson Electric Co. v. NLRB,* 649 F.2d 589, 592 (8th Cir.1981)), *cert. denied,* 510 U.S. 1092, 114 S.Ct. 922, 127 L.Ed.2d 215 (1994); *see also Bell Foundry Co. v. NLRB,* 827 F.2d 1340, 1343 (9th Cir. 1987) ("As the party challenging the election, [the employer] had the burden of showing by specific evidence at the hearing that 1) improprieties occurred, and 2) that they interfered with the employees' exercise of free choice to such an extent materially to have affected the election results."). Moreover, as the Second Circuit stated in *NLRB v. Black Bull Carting, Inc.,* 29 F.3d 44, 46 (2d Cir. 1994),

> A party seeking to overturn an election on the ground of a procedural irregularity has a heavy burden[,] [and] [t]he presence of such an irregularity is not in itself sufficient to overturn an election.... Nor is it sufficient for a party to show merely a "possibility" that the election was unfair.... Rather, the challenger must come forward with evidence of actual prejudice resulting from the challenged circumstances.

*Id.* at 46 (citations omitted). Thus, it is clear that an indispensable part of asserting a successful challenge to a representation election is to establish that, but for the alleged objectionable conduct or procedural irregularities, the result of the election would have been different. *E.g., NLRB v. Earle Industries, Inc.,* 999 F.2d 1268, 1272 (8th Cir.1993)

("The party challenging the outcome of the election bears the heavy burden of 'producing evidence sufficient to mandate a result different from that obtained through the casting of ballots.'") (quoting *NLRB v. Krafcor Corp.*, 712 F.2d 1268, 1269 (8th Cir., 1983)).

■ A determination of whether the results of a representation election have been materially affected by certain conduct or irregularities, and whether the result would have been different in their absence, necessarily entails a consideration of the totality of the circumstances. However, "the cumulative impact of several incidents 'may not be used to turn a number of insubstantial objections to an election into a serious challenge.'" *NLRB v. Lake Holiday Associates, Inc.*, 930 F.2d 1231, 1238 (7th Cir.1991) (quoting *NLRB v. Browning–Ferris Industries of Louisville, Inc.*, 803 F.2d 345, 349 (7th Cir. 1986)) (internal quotation marks omitted).

It is with these principles in mind that we consider Kaolin's objections to the representation election and order of the Board.

### A. The Spanish Interpreter

■ Kaolin's principal argument on appeal is that the ineptitude of the Spanish interpreter destroyed the requisite laboratory conditions of the representation election to such an extent that it prevented the employees from exercising their free choice in deciding whether to select the Union as their collective bargaining representative.

In its March 12, 1996 order, the Board stated as follows:

> With regard to the issue of the Spanish interpreter, the hearing examiner found that the interpreter was unable to meaningfully assist voters who had questions regarding the voting procedure and the ballot. However, as discussed above in sustaining exceptions to these findings, the hearing examiner's findings were based on speculative testimony by Kaolin's election watchers rather than testimony by the employe[es] who were actually doing the voting. Upon review of the record, we find Kaolin only offered testimony by a single employe[e] that he did not understand the nature of his vote. Otherwise, there is no

evidence on the record to show that any voter failed to vote or was unable to exercise the right to vote due to problems with translation.

(Board Order, 3/12/96, at 9.) Notwithstanding the fact that the incompetence of the Spanish interpreter is not in dispute, we must conclude that the Board did not abuse its discretion in reaching this conclusion.

■ As noted above, the so-called "laboratory conditions" standard is an abstract concept which must be applied in a practical manner; in this respect, it is more of a theoretical objective than a definitive legal standard. *See Amalgamated Service & Allied Industries Joint Board, Amalgamated Clothing & Textile Workers.* The mere fact that the election conditions were less than ideal is not, by itself, a sufficient basis for setting aside the election results altogether. *Duriron Co.* The party challenging a representation election must establish a causal relationship that the irregularities materially affected the results of the election, and, in this case, the Board found that Kaolin failed to meet its burden in this regard. We would have to agree.

As the Board observed, Kaolin presented the testimony of a single employee, Jose Tapia, who testified that he did not understand the nature of his vote.

After a review of Mr. Tapia's testimony, however, we question whether this employee's confusion was purely the result of any ineffectiveness on the part of the Spanish interpreter. Indeed, certain aspects of Mr. Tapia's testimony indicate that he would most likely have had difficulty understanding the nature and gravity of his vote even if there had been a competent Spanish interpreter present to assist him. When questioned by counsel for the Union on cross-examination, Mr. Tapia testified as follows:

Q: Mr. Tapia, you indicated that you can read in Spanish, is that correct?

A: Yes.

Q: I am going to show you a piece of paper which has been marked as Union Exhibit No. 1, and I am going to ask you to take a moment and just read the piece of paper in front of you

over to yourself, okay? Just take a moment and read the piece of paper in front of you.

(Witness perusing document.)

MR. READ: I am going to ask the translator to translate from the written Spanish beginning with the word "elecciones," the paragraph that follows that aloud into English.

. . . .

(Interpreter reading document aloud in Spanish.)

MR. READ: If you could translate [that] paragraph into English, please?

MR. RODRIGUEZ[11]: This election is to determine a person to represent the workers for collective negotiations of the price of pay, salary, hours and other conditions of work, of the workers, and it will form a subdivision of the collective negotiation of the Employer which will be determined by Pennsylvania Board of Relations of work.

Q: Senior Tapia, did you understand the paragraph that the translator read to you when he read it in Spanish?

. . . .

A: Not very well. We come from an area where there is not too much studies. A lot of the words, I do not understand.

Q: Okay. . . . Did you attend any meetings at the company at which Mr. Pia and other officials of the company, including Mira, spoke at Alpine—in advance of the election?

A: Yes.

Q: Did you understand that an election was being conducted on May 27th to determine whether or not there would be a union in the company?

A: Yes.

. . . .

MR. READ: Let me have you look at the bottom of the piece of paper [ (the

ballot) ], if you would, and ask you to read the part first beginning with the word "marque" to the witness, and then the two choices for the two boxes.

First read it in Spanish and then translate it.

(Interpreter reading document in Spanish.)

MR. READ: Okay, if you will translate that to English, now, please?

MR. RODRIGUEZ: Mark only one square. Mark a cross in the square that you will prefer. Kaolin's union of workers; bottom one, no representative.

Q: Were you able to read the part beginning at the middle of the page that the translator just read to you? Were you able to read that in Spanish?

A: (Witness nods.)

. . . .

Q: Are you able to understand that the instructions tell you to choose between one of the two boxes?

. . . .

A: I cannot. I cannot understand what this means and this means (indicating).

[Q:] Okay. Pointing to the Kaolin Worker's Union, and the No Representative boxes. . . . My first question to you is, did you understand that the instructions in the middle of the page told you to mark an "X" in one box or the other?

A: I can't understand that. There will be an "X" put in either one of the boxes. I was expecting that it would say: yes, union; no, union.

(Notes of Testimony (N.T.), 8/19/93, at 254–58; R.R. at 296–300.)

Thus, the record indicates that after being read the ballot in Spanish during the hearing, by a presumably competent Spanish interpreter (Ricardo Rodriguez), Mr. Tapia still did not comprehend the ballot.[12] This

---

11. Ricardo Rodriguez was the Spanish interpreter present during the hearing to translate for witnesses questions propounded by counsel from English into Spanish.

12. We also note that, because Mr. Tapia claims to be able to read and understand Spanish, his testimony does not by itself support Kaolin's contention that the interpreter confused the "largely illiterate" electorate and, therefore, also under-

fact becomes even more puzzling when considering that the Board's order and the sample ballots were posted in various locations, including an area beside the time clock, for review by the employees prior to the election and that the employees thus had ample opportunity to evaluate the ballot choices in advance.

Yet, Mr. Tapia testified that the primary reason he was so confused by the ballot was because he expected the ballot to read simply "yes, union" or "no, union." (N.T., 8/19/93, at 258; R.R. at 300.) However, the ballots were straightforward, and, although the ballot did not have those choices verbatim, they had choices worded nearly identical to those: "**Union** de Trabajadores" or "**No** representante." (R.R. at 9.) (Emphasis added.)

The purpose of interpreters at Board conducted representation elections is to explain the voting *procedures* and not to provide a detailed explanation of the labor law concept that choosing "no representative" is not necessarily tantamount to voting in favor of your employer.[13] Mr. Tapia's testimony reveals that he understood the ballot choice stated "no representative" in Spanish; he simply did not understand that selecting that choice was the equivalent of selecting, in his words, "union, no." In his mind, the representation election required him to vote for either the union or his employer. Based on his testimony, it appears that Mr. Tapia's confusion derived from the fact that the name of the employer did not appear on the ballot. However, it is the policy of both the NLRB and the PLRB not to style ballot choices as votes for either the union or the employer or to promote representation elections as necessarily pitting the union against the employer. *See* 34 Pa.Code § 95.51(b); *see also* Section 605(4) of the Public Employe Relations Act (PERA), Act of July 23, 1970, P.L. 563, *as amended,* 43 P.S. § 1101.605(4).

Therefore, we question whether Mr. Tapia's confusion was, in fact, causally related

to the Spanish interpreter and whether a fluent interpreter would have permitted him to cast a ballot more informed than the one he claims to have cast. It is difficult to believe that, with the Board's order and sample ballots posted, and after attending union organization meetings, this individual still did not even know the name of the union, especially when he stated that he was capable of reading Spanish. (N.T., 8/19/93, at 254–55; R.R. at 296–97.)

Of critical importance, however, is the fact that the confusion on the part of this single employee is not sufficient to establish that confusion "pervaded" the election, and it is certainly not sufficient to establish that a representation election, in which 243 voters participated and in which 140 votes were cast in favor of the Union, was so materially impacted as to warrant setting aside the entire election and holding a new one. *See Millard Processing Services, Inc.; Bell Foundry Co.*

 We note that Kaolin also relies heavily on the testimony of two of Kaolin's election observers, Mayra May and Kristen Gotwals, who testified that, based upon comments purportedly made by employees during the election, they believed many of the voters were confused by the Spanish interpreter. The hearsay testimony of Ms. Gotwals was properly objected to by counsel for the Union, and that objection was ultimately sustained by the hearing examiner. Although the testimony of Ms. May was not objected to on the basis that it was hearsay, it was objected to on the basis that it was incompetent because it was mere speculation as to the employees' states of mind. Kaolin nevertheless argues that the Board abused its discretion in ascribing little evidentiary weight to the testimony of Ms. May and Ms. Gotwals.

The Board concluded as follows:

> This instruction was substantially as follows: 'Here's your ballot, take it behind the booth, place an "X" in the block of your choice, fold it, bring it out, place it in the ballot box.' (Board's Order, 3/12/96, at 2; Finding of Fact (F.F.) No. 197.)

---

mines Kaolin's contention that Mr. Tapia was a "typical" employee.

**13.** The Board found as follows:
197. ... Ms. McGeehan ... provided instruction to the Spanish interpreter as to what to tell voters regarding the voting process.

[W]e agree with the Union's contention that the testimony of the Kaolin election watchers is not substantial, probative evidence that employes did not understand the voting process or meaning of the ballot. The Kaolin election watchers simply offered their own subjective opinion regarding these matters (over objection by Union counsel that the witness could not offer probative testimony). Such opinion testimony by a witness, who is obviously aligned with the employer and cannot possibly know what is transpiring in the minds of the voters, is not substantial evidence for a finding of fact that employes lacked sufficient understanding to freely exercise their choice for or against representation by the Union. . . .

. . . .

Kaolin watcher, May, further testified that she believed voters were confused because the translator explained that the upper box was for the 'Union' and the lower box was 'no[ ] representative.' The reason for May's concern was that the translator 'didn't say Kaolin' . . . in referencing a voter's choice not to vote for the Union. However, it is not the Board's policy to style ballot choices as votes for the union or the employer. . . . The 'employer' never appears as a ballot choice in Board conducted elections. We find that May's testimony, premised on the failure of the translator to communicate to voters that a vote not for the Union is support for Kaolin, does not provide an adequate foundation to base conclusions regarding the voters' state of mind.

(Board's Order Directing Remand to Board Representative, 3/12/96, at 4–5.)

In order to address this issue, we must first consider the evidentiary principles enunciated by this Court in *Walker v. Unemployment Compensation Board of Review*, 27 Pa.Cmwlth. 522, 367 A.2d 366 (1976).

(1) Hearsay evidence, properly objected to, is not competent evidence to support [a finding]. . . . (2) Hearsay evidence, admitted without objection, will be given its natural probative effect and may support a finding . . . if it is corroborated by any

competent evidence in the record, but a finding of fact based solely on hearsay will not stand.

*Id.* 367 A.2d at 370 (citations omitted). Thus, because the testimony of Ms. Gotwals was properly objected to by counsel for the Union, and because hearsay testimony which has been properly objected to is not competent testimony to support a finding by an administrative agency, the Board did not err in ascribing little probative value to this evidence.

■ With respect to the hearsay testimony of Ms. May, as noted above, the only objection made by counsel for the Union was that her testimony was unduly speculative in nature. Therefore, such testimony may be given its natural probative effect by the Board only if such unobjected to hearsay was corroborated by other competent evidence of record. However, even assuming *arguendo* that Ms. May's testimony was sufficiently corroborated by the testimony of Mr. Tapia to have any probative effect, we would nevertheless have to conclude that the Board did not err in ascribing little evidentiary weight to this evidence as well. As we stated in *Walker*, unobjected to hearsay is to be given its "natural probative effect," and, in the Board's estimation, the probative value of Ms. May's testimony was drastically discounted by its speculative nature as well as by Ms. May's strong allegiance to Kaolin in this case. The Board is the ultimate fact finder and is therefore entitled to make its own determinations as to witness credibility and evidentiary weight. *Peak v. Unemployment Compensation Board of Review*, 509 Pa. 267, 501 A.2d 1383 (1985). In this case, we do not believe that there exists a sufficient basis for usurping the Board's role in this regard, and we thus decline to do so.

**B. Voters Who Lacked Proper Identification and Two Voters in One Booth at the Same Time**

■ Kaolin also argues that we should set aside the representation election and order a new one because "the board disenfranchised voters who lacked identification." [14]

14. We initially note that the Board's May 21, 1993 Order and Notice of Election, which was

The circumstances surrounding this facet of the case are best expressed by the findings of the hearing examiner as adopted by the Board:

199. At the beginning of the election, the election officers asked each of the voters for identification in conformity with the election officers' understanding of the order of the PLRB that employes 'shall bring' identification....

200. Shortly after the election began at the Alpine farm, a voter came to vote without identification.... Ms. McGeehan informed the voter that he could not vote without identification, and he left the site.... The Spanish interpreter told the workers waiting in line outside in broken Spanish that if they did not have identification they would have to leave.... The interpreter's comments caused a lot of commotion among the workers in line and [a] number of them walked away....

....

202. The PLRB representatives and attorneys for the parties to the election agreed ... within five minutes of this occurrence, that pending further instructions by the PLRB's Representation Coordinator, John Neurohr, the PLRB would allow anyone without identification to vote subject to challenge by the PLRB based upon lack of identification....

203. The election was not stopped while the identification issue was resolved.... The issue was promptly resolved between counsel for Kaolin and the Union and the PLRB....

204. The person who was initially told that he could not vote without identification ultimately was allowed to vote, but was challenged by the PLRB representatives....

posted in conspicuous locations prior to the election, specified that proper identification would be required to participate in the election. Specifically, the order stated as follows: "All employes who wish to vote in the election shall bring to the election a suitable form of identification (driver's license, social security card, or other suitable evidence) in English script." (Board Order, 5/21/93, at 2; R.R. at 5.) During the election, however, the parties apparently agreed to relax this identification requirement.

....

206. Kaolin's counsel[,] [Robert Haas,] attempted to contact Mr. Neurohr at the PLRB's Harrisburg office as soon as that office opened at 8:30 a.m.... Mr. Neurohr spoke with Mr. Haas a short time later and Haas informed him that the PLRB was challenging voters who lacked identification.... Mr. Neurohr informed the chief counsel of the PLRB that it was his understanding that it was up to the parties, and not the PLRB, to challenge voters who lacked identification.... Shortly thereafter, the Chief Counsel of the PLRB directed Mr. Tietze to cease the challenging of voters without identification....

207. At small group meetings held immediately prior to the election Kaolin reviewed with workers provisions as to the challenging of ballots and reassured workers that the vote of persons who were challenged would remain confidential....

208. After Ms. McGeehan made the decision that workers without identification could vote subject to challenge, Ms. May made an effort to communicate with persons who had left the voting area to tell them they could vote.... Ms. May went out to the bus which had brought 30–35 workers from the M & J plant of Kaolin to the Alpine plant voting site in order to tell workers there that they could vote even if they did not have identification.... Ms. May was able to gather four of the workers who had left the polling area after having been told that they could not vote without identification....

(Proposed Decision and Order, 4/5/95, at 43–45; F.F. Nos. 199–200; 202–04; 206–08; R.R. at 111–13.) [15]

15. In this regard, Kaolin also contends that the Board ostensibly compromised the secrecy of the election by requiring voters lacking identification to sign their name on a list. However, Kaolin presented no testimony indicating that a single employee refused to vote due to their impression that the "veil of secrecy" had been removed from the election. To the contrary, the record indicates that measures were taken to assure the employees that the identification process would not in any way compromise the confidentiality of the voting process. We also note that, although

Additionally, Kaolin argues that its election observers witnessed, on a number of occasions, two voters occupying the same voting booth at the same time, and, consequently, that here again the requisite laboratory conditions were sufficiently tainted to set aside the election results.

With respect to these issues, the Board, in its March 12, 1996 order, concluded as follows:

> The presence of more than one voter in the voting booth at the same time is a most serious matter because the secrecy of the ballot may thereby be compromised. Where there is evidence of more than one voter in a voting booth at the same time, the National Labor Relations Board views the ballots of those voters as "impaired" and then considers whether the number of impaired ballots are sufficient to affect the results of the election.... Where the margin of victory in the election exceeds the number of impaired ballots, the NLRB does not overturn the election on that basis....
>
> The hearing examiner found that a PLRB election officer observed two voters in the voting booth at the same time four to five times during the election. However, even if we take the higher number of five and conclude that ten ballots were thereby impaired, the Union prevailed by 38 votes. Therefore, the occurrences of more than one voter in the voting booth, in and of themselves, do not warrant setting aside the election, but must be regarded in the context of the potential impact on the election outcome.
>
> . . . .
>
> The hearing examiner found that three of the ten employees who left the polling area because of lack of identification did not vote, although at least two of these employees voluntarily chose not to return to vote after being informed that they could do so even without identification ( [F.F. Nos.] 210–211, 216.) The hearing examiner also found, consistent with the testimo-

ny of a Kaolin election watcher, that she was able to 'gather' four of the employes who had left the polling area because they lacked identification and brought them back to vote. (F.F. [No.] 208.) Thus, viewing the hearing examiner's findings in the light most advantageous to Kaolin, between three and six employes did not vote because of the identification issue. However, even if we assume that all of these employes would have voted against representation by the Union, their votes would not change the election result. Indeed, regardless of whether the number of employes affected by the identification issue is three (as found by the hearing examiner) or six (under a best case scenario for Kaolin), their cast votes would not change the election result, even if added to the number of votes impaired by the presence of two voters in a voting booth at the same time (ten).

(Board Order, 3/12/96, at 8–9.) (Citations omitted.)

Even adopting the figures most favorable to Kaolin regarding two voters occupying one booth, and assuming that all employees who did not vote due to lack of identification would have selected "no representative," the total number of votes alleged to have been impaired is still only 17 (including the vote of Mr. Tapia who testified he was confused) and is therefore insufficient to compensate for the Union's margin of victory, which was 38 votes. As noted above, it is a firmly established labor law principle that the number of successfully challenged ballots must be sufficient to affect the outcome of the election. *E.g., Bridgeport Fittings, Inc. v. NLRB,* 877 F.2d 180 (2d Cir.1989) (holding that, because the votes affected were not sufficient to alter the outcome of the election, the NLRB did not abuse its discretion in refusing to set aside a representation election where the ballots were not translated into Cambodian or Vietnamese). Therefore, we must agree with the Board's conclusion and reject these

---

Kaolin has consistently argued below that the Board improperly disenfranchised the right to vote of those employees who turned away and did not vote once they heard the announcement that proper identification was required, nowhere in its petition for review or in any of the exceptions filed below does Kaolin specifically maintain that the Board's identification procedures created the impression that the secrecy of the entire voting process was compromised.

grounds as a basis for setting aside the election and ordering a new one.

### C. Alleged Improper Electioneering

 Kaolin next argues that the election should be set aside due to alleged improper electioneering that took place when employees supporting the union congregated outside the polling area, wore prounion T-shirts, and yelled in Spanish to employees things such as: "If you're not voting for the Union, just go back."

The Pennsylvania Code provides that improper electioneering may be the basis for setting aside a representation election:

§ 95.52 **Procedures for on-site elections.**

(b) **Polling area.** Before the commencement of an on-site election, the agent of the Board will designate the polling area. No electioneering of any kind may take place within this area. A violation of this requirement by any party or its agent may be grounds for setting aside the election.

34 Pa.Code. § 95.52(b) (emphasis added). The Board's election officer designated the voting room and its contents as the polling area.

Kaolin argues that, although the electioneering in this case occurred *outside* the area designated as the "polling area," we should nevertheless set aside the election because "the restricted delineation of the polling area to exclude the area immediately outside of the voting room at the Kennett plant, and the Board's acceptance of this delineation, constitutes reversible error." (Kaolin's Brief at 47.) Thus, *Kaolin* urges us to construe the polling area to be broader than that defined by the Board and to conclude that the electioneering which took place occurred within this expanded area. However, we must reject this argument for several reasons. First, the statute is clear that the Board agent has the discretion to designate the polling area and that the prohibition against electioneering applies only to this area. It is well settled that, "in reviewing the discretionary acts of an agency, a reviewing court may interfere only when there has been a manifest and flagrant abuse of discretion or a

purely arbitrary execution of the agency's functions or duties." *Keystone Health Plan West v. Department of Health,* 147 Pa. Cmwlth. 686, 609 A.2d 612, 615 (1992) (citing *Slawek v. State Board of Medical Education & Licensure,* 526 Pa. 316, 586 A.2d 362 (1991)). The record does not indicate that such was the case here.

Second, the electioneering involved in this case was engaged in by union-supporting employees, rather than by union officials or representatives, and the significance of this distinction is conceded by Kaolin in its brief. When electioneering is conducted by third parties, such as prounion employees, rather than by parties to the election itself, it is gauged by a less exacting standard in determining whether it justifies setting aside the election. As the United States Court of Appeals for the Eleventh Circuit observed in *Certainteed Corp. v. NLRB,* 714 F.2d 1042 (11th Cir.1983),

[A]ctivities of a union's employee-adherents which are not attributable to the union itself receive less weight in determining that an election should be set aside. NLRB v. Southern Metal Service, Inc., 606 F.2d 512, 515 (5th Cir.1979). Their coercive conduct or other actions must be 'so aggravated that a free expression of choice of representation is impossible.'

*Id.* at 1060 (quoting *NLRB v. Monroe Auto Equipment Co.,* 470 F.2d 1329, 1332 (5th Cir.1972), *cert. denied,* 412 U.S. 928, 93 S.Ct. 2752, 37 L.Ed.2d 155 (1973)). The electioneering was not "so aggravated" in this case to render impossible the employee's expression of free choice. In fact, the electioneering engaged in by prounion employees in this case, *i.e.,* wearing prounion T-shirts and shouting "vote for the union or go back," seems to have been relatively mild. The record does not indicate that any threats of reprisal or physical intimidation occurred or that these employees were in any way verbally abusive or intimidating. Although these latter methods of electioneering are not essential to justify setting aside a representation election, the record before us certainly does not indicate that the electioneering efforts were so egregious, influential, or ag-

gressive to warrant such an extreme measure.

Last, even if we were to accept Kaolin's proposed expanded no-electioneering area, the language of the statute, as well as decisions of the NLRB, indicate that the mere existence of electioneering at the election site is not, by itself, sufficient to set aside a representation election.[16] We also find persuasive the Eleventh Circuit's conclusion in the *Certainteed Corp.* case cited above:

> The non-party electioneering at issue here appears to have been random, spontaneous and limited to brief remarks. No employee stated that he was confused, distracted, pressured, intimidated or influenced in any way in his voting, and ... only one voter stated he even heard these comments while in the voting area.... In the absence of any evidence of influence or intimidation, the Company did not sustain its burden of showing disruption of the election or impairment of free choice.

*Id.* at 1063 (citing *NLRB v. Aaron Brothers Corp.*, 563 F.2d 409, 412 (9th Cir.1977); *NLRB v. Golden Age Beverage*, 415 F.2d 26, 31 n. 25 (5th Cir.1969)).

Similarly, in the instant appeal, although a few employees testified that they observed the electioneering taking place *outside* of the voting room, no employee testified that they were influenced or intimidated by that activity or that their free choice in casting their ballot had been impaired in any way. Therefore, although the statute prohibits electioneering of any kind within the "polling area," we must conclude that, even if we were to accept Kaolin's expanded definition of "polling area," Kaolin failed to meet its burden in establishing that the impact of the electioneering was such that the results of the election should be set aside.

### D. Media Presence

■ Kaolin also claims that the presence of the media "in and around the voting rooms during the election constituted an impermissible interference." In so arguing, Kaolin cites a Venango County Court of Common Pleas decision, *In re Employees of Oil City Hospital*, 5 Pa. Pub. Employe R. 1, 74 Lab. Cas. ¶ 53,410, 1974 WL 18288 (Venango Co. C.P.1974), *order set aside and case remanded*, 18 Pa.Cmwlth. 192, 335 A.2d 537 (1975), in which Board agents permitted members of the press to take photographs of voters while in the act of voting and to remain in the polling area for approximately twenty-five minutes.

The following findings of fact were made by the hearing examiner and adopted by the Board on this issue:

> 232. PLRB Election Officer McGeehan was aware of one time at approximately 11 a.m. in Kennett Square when a member of the press came into the voting area who had a camera on his shoulder without a red blinking light on indicating that it was taping.... There may have been two other members of the press with him.... Ms. McGeehan 'immediately told him to get out of the election site, but he could come in after to film, or at the next site before the election starts.' ... This individual was in the voting area for twenty seconds....

> 233. At the second polling site, Election Officer Tietze encountered two members of the media approximately twenty-five feet from the door to the voting room. Mr. Tietze informed them that they were not permitted to film in that area.... Mr. Tietze was not present when the media entered into the polling area....

> 234. While voting was in pro[gr]ess, Mr. Pia and Mr. Wagoner observed a person with a television camera immediately outside of the voting area at the Kennett farm for approximately ten to fifteen minutes.... In addition, a reporter walked next to the voting room and loitered outside the voting room talking to voters for approximately five to ten minutes.

(Proposed Decision and Order, 4/5/95, at 49; F.F. Nos. 232–34; R.R. at 117.)

---

**16.** Although the statutory prohibition against electioneering within the polling area is unconditional, such conduct does not automatically require that the election be set aside. To the contrary, the statute says only that such electioneering *may* be the basis for setting aside the election.

We find Kaolin's reliance on the *In re Employees of Oil City Hospital* decision to be misplaced. First, this Court set aside the lower court's order in *Oil City Hospital* and remanded that matter for further proceedings on the issue of jurisdiction. Second, in the *Oil City Hospital* case, the press was permitted to remain in the polling area for an extended period of time, and no board agent undertook measures to remove him from the area.[17] Furthermore, the media in that case actually photographed employees while in the act of voting.

No evidence in this case, however, indicates that voting was actually filmed or, perhaps more important, that the employees had the perception that such filming was taking place. The record only indicates that members of the media were present outside of the polling area at brief moments during the election, and that one member of the press was in the voting room without filming for approximately twenty seconds before being removed. The record also does not indicate that a single employee was in any way influenced or intimidated by the media presence. Moreover, Kaolin cites no relevant authority for the proposition that an election must be set aside simply where members of the media were present *outside* of the polling area.

Consequently, we cannot agree with Kaolin that the brief media presence inhibited the expression of free choice by the employees during the election, and we must therefore reject this argument and accept the Board's

position that the media presence did not have an impact on the election sufficient to set it aside.

### E. Alleged Unfair Labor Practices by CATA

Finally, Kaolin argues that the May 23, 1993 election should be set aside due to unfair labor practices committed by CATA seven to eight weeks prior to the election. The relationship between CATA and the Union is not discussed by either party in its briefs and is not explicitly described anywhere else in the record.[18] However, assuming, *arguendo*, that the Union and CATA are sufficiently affiliated for the acts of one to be imputed to the other, we still must conclude that the Board did not err in determining that these alleged unfair labor practices did not have a material impact upon the election.

Factors which the Board may consider include the severity of threats or incidents, the number of workers threatened and the proximity of the threats in time to the election. *Zeiglers Refuse Collectors, Inc. v. NLRB*, 639 F.2d 1000, 1005 (3d Cir.1981) (citing *Monmouth Medical Center v. NLRB*, 604 F.2d 820, 823 n. 4 (3d Cir.1979)). If the board determines that there was a substantial possibility that the threats or incidents affected the outcome of the election, the election must be set aside and a new election held. *Id.*

In this regard, this Court has specifically held that the Board has broad discretion in

---

**17.** The Board points out in its brief that, since the *Oil City Hospital* case was decided in 1974, the Board has implemented a policy whereby Board agents are instructed to remove press and media reporters and photographers during times when actual voting is taking place.

**18.** We note, however, that on pages 86 through 91 of the hearing examiner's Proposed Decision and Order, the hearing examiner analyzes the relationship between the Union and CATA and ultimately concludes that they are "allies in interest." Additionally, we note that on July 27, 1993, Kaolin attempted to amend the unfair labor practice charge filed on April 6, 1993, by adding, among others, the Union as a respondent. The Secretary of the PLRB dismissed the amended charge, reasoning that the addition of new parties as respondents was tantamount to a new cause of action which was not timely filed pursuant to Section 9(e) of the PLRA, 43 P.S.

§ 211.9(e), and the Board issued a final order to this effect on September 7, 1993. In affirming the Board's decision to dismiss the amended charge, this Court held that Kaolin's ability to proceed against the Union, when only CATA was named in the original timely-filed charge, was dependent upon whether the additional parties, including the Union, were "alter egos" of CATA. See *Kaolin Mushroom Farms, Inc. v. Pennsylvania Labor Relations Board*, 164 Pa.Cmwlth. 243, 642 A.2d 612 (1994). In that appeal, Kaolin contended that CATA and the Union, as well as their respective officers and agents, were "alter egos and/or allies in interest" for the purpose of organizing a union and that they jointly engaged in organizing, participating and maintaining a strike against Kaolin for the purpose of forcing Kaolin to recognize the Union as the exclusive collective bargaining representative. *Id.* 642 A.2d at 614.

determining whether an unfair labor practice precludes a fair election. *Charley v. Pennsylvania Labor Relations Board,* 136 Pa. Cmwlth. 411, 583 A.2d 65 (1990), and, as noted above, we will only review the Board's discretionary acts upon a finding of bad faith, fraud, capricious action, or abuse of power. *Id.* 583 A.2d at 67. In the present case, Kaolin has failed to make such a showing.

The hearing examiner concluded that the seven-to-eight week period between the alleged unfair labor practices and the election was too remote to have an impact on the election, and the Board adopted this conclusion. As the hearing examiner noted, "the NLRB typically refuses to overturn elections based upon conduct occurring prior to the date the representation petition was filed" absent a showing of pre-petition threats or violence that are so egregious that an atmosphere of coercion still remained at the time of the election. *See NLRB v. Claxton Poultry Co., Inc.,* 581 F.2d 1133 (5th Cir.1978). Both the Board and the hearing examiner agreed that such threats or violence did not occur in this case, and the record does not indicate otherwise.

### III. CONCLUSION

Considering the record before us and our limited standard of review on appeal, we must conclude that the evidence of record simply is not sufficient to overcome the presumptive validity of the election results or the deference this Court is required to give decisions of the Board in such matters.

Order affirmed.

### *ORDER*

**NOW,** November 10, 1997, the order of the Pennsylvania Labor Relations Board in the above-captioned matter is hereby affirmed.