**BLUE MOUNTAIN MUSHROOM COMPANY, INC., Petitioner,**

v.

**PENNSYLVANIA LABOR RELATIONS BOARD, Respondent.**

Commonwealth Court of Pennsylvania.

Argued June 14, 1999.

Decided July 27, 1999.

Reargument Denied Sept. 28, 1999.

---

Kurt A. Miller, Pittsburgh, for petitioner.

John B. Neurohr, Harrisburg, for respondent.

Before DOYLE, J., FRIEDMAN, J., and JIULIANTE, Senior Judge.

JIULIANTE, Senior Judge.

Blue Mountain Mushroom Company, Inc. (Employer) petitions for review of the October 20, 1998 Final Order of the Pennsylvania Labor Relations Board (Board) that dismissed Employer's exceptions to a nisi order of certification, which certified the Comite de Trabajadores de Blue Mountain, a/k/a, Workers Committee of Blue Mountain (Union) as the exclusive representative for purposes of collective bargaining with Employer with respect to rates of pay, wages, hours and other condi-

tions of employment. We affirm the order of the Board.

## Background

On May 9, 1997, the Union filed with the Board a petition for representation seeking to represent a unit of all full-time and regular part-time mushroom production employees and maintenance employees related to the Employer's mushroom production facility for purposes of collective bargaining under the Pennsylvania Labor Relations Act (PLRA), Act of June 1, 1937, P.L. 1168, *as amended,* 43 P.S. §§ 211.1–211.13.

In its petition, the Union requested that the Board conduct a 20–day election pursuant to Section 7(c) of the PLRA, 43 P.S. § 211.7(c), which provides in part that "if either party to the controversy so requests, a secret ballot of the employes shall be taken within twenty days after such request is filed." The Board then contacted representatives and counsel from Employer and the Union in an effort to mutually arrange the details of the election, including the date, times, locations, eligibility list and other matters.

The Board scheduled the election for May 30, 1997, which was a payday for the employees, a date upon which the maximum voter turnout could be expected. Because the May 30 election date fell 21 days after the Union's May 9, 1997 petition, the Union filed a May 21, 1997 letter (May 21 letter) withdrawing the initial 20–day request and simultaneously requesting another 20–day election. The Union's letter was received by the Board on May 22, 1997. The Union, however, did not send a copy of the May 21 letter to Employer.

On May 22, 1997, the Board issued an order and notice of election directing the election for May 30, 1997. In the order and notice of election, the Board explained that because of the 20–day election request, the Board was required by law to first conduct the election within 20 days, and then after the election, make a determination as to the appropriate unit. The

notice of election also contained an eligibility list and stated that either the Union or Employer could challenge the ballot of any employee on the eligibility list.

On May 23, 1997, the Board received a letter from Employer, dated May 20, 1997, objecting to the Board's exercise of jurisdiction. On May 27, 1997, the Board received a second letter from Employer objecting to: 1) the Board's jurisdiction; 2) the bargaining unit in which the election would be conducted; and 3) the date for the election. Copies of these letters were not sent to the Union.

On May 30, 1997, the election was conducted as scheduled. The results were that 81 employees voted in favor of the Union, 40 employees voted for no representative, 7 employees cast ballots that were challenged by either the Board or the Union and 5 ballots were blank. Employer did not challenge any of the ballots.

On June 5, 1997, the Board issued a notice of hearing on the Union's petition for representation. The next day, Employer filed objections to: 1) the Board's jurisdiction over mushroom employees; 2) the appropriateness of the bargaining unit; 3) the failure of the Board to determine the appropriate bargaining unit prior to the election; 4) the fact that employees cast ballots in a unit that was not yet determined; 5) the Board's failure to conduct an election within 20 days of the Union's initial request for a 20–day election; and 6) the Board's failure to direct that a hearing be held after the Union had withdrawn its initial 20–day election request.

On July 3, 1997, the Board issued an order directing that a hearing be held on Employer's first four exceptions and that Employer raise its fifth and sixth objections to the prospective nisi order certifying the election. Hearings were then held on the Union's petition for representation and Employer's objections to the election.

On March 13, 1998, the Board's Hearing Examiner issued a Proposed Decision and

Order resolving both Employer's objections and the issues raised by the Union's petition for representation. The Hearing Examiner determined that mushroom workers were not "agricultural laborers" within the meaning of Section 3(d) of the PLRA, 43 P.S. § 211.3(d), which excludes agricultural laborers from the Board's jurisdiction. The Hearing Examiner further determined that the appropriate bargaining unit included all full-time and regular part-time employees in the fill-in and take-out department, the spawning department, the casing department, the watering department, and the harvesting department. The Hearing Examiner excluded office and clerical employees, supervisors, managerial employees, and children and spouses of owners. The Hearing Examiner dismissed Employer's third and fourth election objections.

On March 23, 1998, the Board issued a nisi order of certification that certified the Union as the exclusive bargaining representative for the employees of what the Hearing Examiner determined to be the appropriate bargaining unit. On April 10, 1998, Employer filed exceptions alleging that the Board erred by: 1) concluding that it had jurisdiction over mushroom workers; 2) failing to determine the appropriate unit prior to conducting the election; 3) failing to conduct the election within 20 days of the Union's initial 20-day election request; and 4) failing, after the Union withdrew its initial 20-day election request, to provide for a pre-election hearing before conducting the election.

On May 1, 1998, the Union filed a motion to supplement the record seeking to include the May 21, 1997 letter wherein it withdrew its initial 20-day election request and simultaneously asserted a second 20-day election request. Employer opposed the Union's motion to supplement the record.

On October 20, 1998, the Board issued its Final Order dismissing Employer's exceptions and affirming the nisi order of certification. The Board denied the Union's motion to supplement the record on the ground that the May 21, 1997 letter had been filed and docketed with the Board and was, therefore, already part of the record.

On October 28, 1998, Employer filed a motion to reopen the record seeking to file further exceptions to the nisi order of certification based on the Union's May 21, 1997 letter. Employer further requested that the Board take testimony and other evidence regarding said letter.

In response, the Board issued a December 15, 1998 order treating Employer's motion as a motion for reconsideration under Pa. R.A.P. 1701(b)(3). The Board denied Employer's motion as untimely on the ground that the May 21, 1997 letter was not new evidence, that Employer had knowledge of said letter, that any issues regarding the May 21, 1997 letter could have been addressed at the hearing, and that any challenge to the letter was not likely to compel a different result because under the Supreme Court's decision in *Petition of Shafer*, 347 Pa. 130, 31 A.2d 537 (1943), a party is entitled to withdraw its 20-day election request.

On November 17, 1998, Employer appealed to this Court from the Board's Final Order. Employer presents the following issues for our review: 1) whether the employees who are engaged in the growing of mushrooms at Employer's facility are "agricultural workers" within the meaning of Section 3(d) of the PLRA, 43 P.S. § 211.3(d), and whether those employees therefore fall outside of the jurisdiction of the Board; 2) whether the Board violated Section 7(c) of the PLRA; 43 P.S. § 211.7(c), by failing to conduct a secret ballot election within 20 days of a request for secret ballot election; 3) whether the Board violated Employer's due process rights as well as Employer's statutory rights under the PLRA, by its manner of handling the Union's purported withdrawal and simultaneous reassertion of a 20-day election request; and 4) whether Employ-

er's employees exercised a free and reasoned choice in the May 30, 1997 representation election.

■■■■ Our scope of review "on appeals from orders of the Board certifying exclusive bargaining representatives is limited to determining whether the Board's findings are supported by substantial and legally credible evidence and whether the Board's conclusions are reasonable and not arbitrary, capricious or illegal." *Kaolin Mushroom Farms, Inc. v. Pennsylvania Labor Relations Board,* 702 A.2d 1110, 1115 n. 5 (Pa.Cmwlth.1997), *appeal dismissed as having been improvidently granted,* 554 Pa. 171, 720 A.2d 763 (1998). "Additionally, if the Board's findings are supported by substantial evidence, they are conclusive for purposes of appellate review." *Id.*

### Merits of Employer's Appeal

### I.

Employer's first argument is that the Board does not have jurisdiction over Employer or its employees because mushroom workers are "agricultural laborers" within the meaning of Section 3(d) of the PLRA, 43 P.S. § 211.3(d). Pursuant to Section 5 of the PLRA, 43 P.S. § 211.5, employees have the right, *inter alia,* to join labor organizations and bargain collectively through representatives of their own choosing. Section 3(d) of the PLRA defines "employee" as follows:

> The term "employe" shall include any employe, and shall not be limited to the employes of a particular employer, unless the act explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute, or because of any unfair labor practice, and who has not obtained any other regular and substantially equiva-

lent employment, *but shall not include any individual employed as an agricultural laborer,* or in the domestic service of any person in the home of such person, or any individual employed by his parent or spouse. (Emphasis added.)

Employer maintains that there is no case law, state or federal, on the issue of whether mushroom workers are "agricultural workers" within the meaning of Section 3(d) and cites *Kaolin Mushroom Farms, Inc.,* where this Court noted

> because most mushroom workers are considered to be performing "agricultural labor," under federal labor law they are not covered by the National Labor Relations Act (NLRA),[1] which specifically excludes agricultural laborers from the definition of "employees" covered by the NLRA. *See* 29 U.S.C. § 152(3). Because the PLRA defines "employees" in substantially the same way as the NLRA, 43 P.S. § 211.3 ("the term 'employe' . . . shall not include any individual employed as an agricultural laborer"), a valid argument may exist regarding whether the PLRA also excludes from the scope of its coverage the mushroom workers involved in this appeal.

702 A.2d at 1113 n. 4 (footnote added).

Employer takes the position that because the PLRA was patterned after the NLRA, Pennsylvania courts should look to decisions under the NLRA for guidance in interpreting similar provisions.[2] Employer acknowledges that prior to 1947, the mushroom workers were not considered to be agricultural laborers under the NLRA and that Congress, in its 1947 appropriations bill, instructed the National Labor Relations Board (NLRB) to utilize the definition of "agriculture" found in the Fair Labor Standards Act (FLSA),[3] which is broad enough to include mushroom farm-

---

1. 29 U.S.C. §§ 151–169 (1999).

2. 29 U.S.C. § 152(3) provides that the term "employee" shall include any employee...

but shall not include any individual employed as an "agricultural laborer...."

3. 29 U.S.C. §§ 201–219 (1999).

ing. *See* 29 U.S.C. § 203(f).[4] Employer maintains that because the PLRA was closely patterned after the NLRA, the General Assembly logically would have intended for the term "agricultural workers" to mean the same thing that Congress intended for the term.

In response, the Board initially cites *In the Matter of Grocery Store Products Co.*, (PLRB Case No. 22 of 1956), where the Board determined that mushroom producing employees fall within the definition of "employe" under the PLRA because the mushrooms, the products of the employee's labor, are an artificially developed product in the nature of a horticultural product rather than an agricultural product. Specifically, in *Grocery Store Products* the Board reasoned:

> The manner in which and the conditions under which these mushrooms are grown is far more properly designated as horticulture than agriculture. Considering the end product secured it is far more an artificial than a natural product produced by tillage under wind, sun, rain and sky. These mushrooms have the same relationship to "wild mushrooms" that orchids, carefully cultivated in greenhouses, bear to the naturally grown species; they are simply, completely different.

*Id.* at 8.

The Board also points out that as initially enacted, the NLRA excluded "agricultural workers" and that in its decision in *Great Western Mushroom Co.*, 27 N.L.R.B. 352, 7 L.R.R.M. 72 (1940), the NLRB, relying on the rationale in its previous decision in *Park Floral Co.*, 19 N.L.R.B. 403, 5 L.R.R.M. 514 (1940), that individuals employed in horticultural endeavors such as growing plants and flowers in commercial greenhouses were not "agricultural laborers" within the meaning of the NLRA, concluded that mushroom workers were not "agricultural laborers" because the commercial production of

mushrooms was not "agricultural" in the common understanding of that term because it was done under artificial conditions similar to those in greenhouses as opposed to on a farm. Therefore, the NLRB concluded in *Great Western Mushroom Co.* that mushroom production was "horticultural" rather than "agricultural" and, that therefore, mushroom workers were not excluded from coverage under the NLRA.

The Board further emphasizes that until 1945, the NLRB continued to exercise jurisdiction over mushroom workers. At that time, the Board did not rethink its position on mushroom workers, but was mandated by Congress in its 1947 appropriations bill to follow the FLSA's definition of "agriculture," which included the production, cultivation, growing and harvesting of horticultural commodities. 29 U.S.C. § 203(f).

The Board in its 1956 decision in *Grocery Store Products*, did not determine that it was constrained to follow the NLRB in redefining the term "employe" to include mushroom workers, but instead determined that unless otherwise directed by the state legislature, the term "agricultural laborer" in the PLRA does not include a worker involved in the production of a horticultural commodity such as mushrooms.

Nevertheless, Employer cites *Appeal of Cumberland Valley Sch. Dist.*, 483 Pa. 134, 394 A.2d 946 (1978) for the proposition that when the policies or provisions of state and federal statutes are the same, the Courts have approved the Board's use of federal precedent as guidance. The Board, however, claims that it was following the NLRB's pre–1945 precedent, before the NLRB's definition of "agricultural laborer" was legislatively altered by Congress. The Board argues that it did not rely upon the subsequent NLRB precedent because the Pennsylvania legislature enacted no such similar change in the

---

4. 29 U.S.C. § 203(f) defines "agriculture," *inter alia*, as "the production, cultivation, grow-

ing and harvesting of any agricultural or horticultural commodities...."

PLRA's definition of "agricultural laborer."

In fact, the Board states that in 1969, the Pennsylvania legislature considered a sole purpose bill, House Bill 389, which would have amended the PLRA's definition of "employe" as follows: "The term 'employe' shall include any employe... but shall not include any individual employed as an agricultural laborer *which shall include among others, a person employed in the growing of mushrooms ....*" (House Bill 389 of 1969, P.N. No. 1717, p. 2, ln 14–15 (emphasis added)).

Although House Bill 389 was passed by the House of Representatives and considered on two separate days by the Senate, it was recommitted to the Senate Labor and Industry Committee, where it died. As a result, the Board maintains that the legislature is aware of the Board's interpretation of the PLRA regarding mushroom workers, as indicated by the fact that it considered a bill which would have amended the Board's jurisdiction to specifically exclude mushroom workers. Consequently, the Board argues that in view of the legislature's failure to pass House Bill 389, there is no reason for this Court to impose a similar interpretation of the term "agricultural laborer" upon the Board.

■ We agree. The Board has consistently held that mushroom production workers do not come within the "agricultural laborer" exclusion in Section 3(d) of the PLRA. Pursuant to Section 1921(c)(8) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(c)(8), where the words of a statute are not explicit, the intention of the legislature may be ascertained by considering, among other things, the administrative interpretation of the statute. *Saia's Used Cars v. Commonwealth,* 142 Pa.Cmwlth. 27, 596 A.2d 1212 (1991). In

*American Fed'n of State, County and Mun. Employees, Council 13, AFL–CIO v. Pennsylvania Labor Relations Board,* 150 Pa.Cmwlth. 642, 616 A.2d 135, 137 (1992), this Court recognized that the Board "possesses administrative expertise in the area of public employee labor relations and should be shown deference." In light of these principles, we believe that the Board's consistent position, that mushroom workers are not "agricultural laborers" within the meaning of Section 3(d) of the PLRA, is the proper interpretation of that provision. As the Board noted, mushrooms are artificially produced year round inside buildings where the light and temperature are controlled. The mushrooms are not grown in soil but in man-made compost, where the temperature and composition is monitored and controlled. Consequently, we agree with the Board that mushroom production is similar to other horticulturally produced commodities and is thus distinguishable from agriculturally grown crops.

Employer, however, contends that the Board is incorrect in assuming that the General Assembly intended to distinguish between agricultural laborers and horticultural laborers. Employer maintains that the General Assembly has passed several laws since the enactment of the PLRA wherein it considers the term "agriculture" to include "horticulture," and more specifically, mushroom growing. To support its position, Employer cites to Section 4(1)(4)(1)(a) of the Unemployment Compensation Law,[5] which provides that "agricultural labor" includes the raising or harvesting of horticultural commodities.

Also in support of its position that the General Assembly considers "agriculture" to include "horticulture," Employer cites, *inter alia:* Section 2(6) of the Agricultural Commodities Act of 1968,[6] which defines

---

**5.** Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended,* 43 P.S. § 753(*l*)(4)(1)(d). The definition of "agricultural labor" cited by Employer was amended by the Act of June 22, 1964, Spec. Sess., P.L. 112.

**6.** Act of September 20, 1961, P.L. 1541, *as amended,* 3 P.S. § 1002(6).

"agricultural commodity" as including horticultural products; Section 103 of the Seasonal Farm Labor Act,[7] which adopted the definition of "agricultural commodity" as defined by the Agricultural Commodities Act of 1968; Section 3 of the Agricultural Area Security Law,[8] which defines "agricultural production" as the production of crops including "horticultural specialties;" Section 2 of the Agricultural Development Act,[9] which defines "agricultural activity" as including the commercial production of horticultural products; Section 2 of the Department of Environmental Resources Agricultural Advisory Board Act,[10] which borrows the definition of "agriculture" set forth the Agricultural Area Security Law; and Section 3 of the Sustainable Agriculture Act,[11] which also defines "agricultural activity" as including the commercial production of horticultural products.

The Board, to the contrary, argues that each of the statutes mentioned by Employer recognizes the difference between "agriculture" and "horticulture" by specifically stating that for the purposes of that statute, "agriculture" includes "horticulture." Hence, the Board argues that when the General Assembly intends to include "horticulture" within the definition of "agriculture" in a particular statute, it does so expressly.

The Board therefore maintains that the legislature's failure to exempt horticultural production workers from coverage under the PLRA is evidence that the legislature only intended to exclude agricultural workers, not horticultural workers. To support its position, the Board cites *Butler County Mushroom Farm v. Department of Environmental Resources,* 61 Pa.Cmwlth. 48, 432 A.2d 1135 (1981), *rev'd on other grounds,* 499 Pa. 509, 454 A.2d 1 (1982), where the Court rejected the argument that mushroom production facilities are "farms" within the meaning of what is commonly known as the General Safety Act: [12]

Butler makes two other points, which we will mention briefly. First, it contended below and still urges that its establishments are farms, exempted from the reach of the "General Safety Act," by Section 1, 43 P.S. § 25–1. Mushrooms are grown in wooden trays in which compost, casing soil and mushroom spawn are blended. Proper growth of the mushrooms requires special conditions of temperature and light and mushrooms are not grown on land out of doors but traditionally in mushroom houses and more recently in caves and mined-out areas where the conditions of temperature and light are suitable and stable, or can be made so. The process is not different from that of cultivating flowers in greenhouses. In neither case is the activity conducted on a farm.

*Id.* at 1138–1139.

Nevertheless, Employer further argues that "horticulture" "is defined as the cultivation of a garden, orchard or nursery; the cultivation of flowers, fruits, vegetables or ornamental plants"[13] and that mushroom are fungi which are not grown in gardens, nurseries or orchards. Therefore, Employer claims that mushrooms are not a horticultural product and that, thus, mushroom workers are not horticultural laborers.

7. Act of June 23, 1978, P.L. 537, *as amended,* 43 P.S. § 1301.103.

8. Act of June 30, 1981, P.L. 128, *as amended,* 3 P.S. § 903.

9. Act of July 2, 1984, P.L. 537, 3 P.S. § 1302.

10. Act of May 20, 1993, P.L. 38, 3 P.S. § 1802.

11. Act of December 12, 1994, P.L. 891, 3 P.S. § 2103.

12. Act of May 18, 1937, P.L. 564, *as amended,* 43 P.S. §§ 25–1–25–15. The General Safety Act excluded "farms" from coverage under the Act.

13. *Random House Unabridged Dictionary* 924 (2d ed.1993).

In response, the Board notes that the definition of "agriculture" also does not include the growing of fungi. Moreover, although mushrooms may be technically classified as fungi, they are nevertheless commercially produced for human consumption much the same as vegetables grown in greenhouses. Consequently, we agree with the Board that mushroom production is essentially the production of a horticultural commodity.

In view of the foregoing discussion, we do not believe that the Board erred in determining that it has jurisdiction over mushroom workers on the ground that they are horticultural workers, not agricultural workers. As pointed out by the Board, the NLRB also initially held that mushroom workers were not agricultural laborers for purposes of that exemption. *Great Western Mushroom Co.* The Board followed the NLRB's initial determination and also found that mushroom workers were not "agricultural laborers" for purposes of Section 3(d) of the PLRA.

Although in 1947, Congress mandated that the NLRB apply the FLSA definition of "agriculture," which included the production of "horticultural commodities," no such state legislation was passed. Indeed, in the Board's 1956 decision in *Grocery Store Products*, the Board determined that it was not similarly constrained by the legislative change to the NLRA and declined to extend the term "agricultural laborer" to mushroom production laborers. Absent a similar mandate by the state legislature, we do not believe that the Board was bound to follow the NLRB. In *American Fed'n of State, County and Mun. Employees v. Pennsylvania Labor Relations Board*, 108 Pa.Cmwlth. 482, 529 A.2d 1188, 1190 (1987), this Court stated that "we know of no authority which would require the Board, deciding questions of state law . . . to blindly follow decisions of the NLRB which involve questions purely of federal law."

Moreover, unlike the statutes cited by Employer where the legislature expressly stated that "agricultural production" includes "horticultural production," at no time during the 40 years during which the Board has consistently held that mushroom workers are not "agricultural laborers," has such language ever been added to the PLRA. As mentioned by the Board, in 1969 the General Assembly considered House Bill 389, which would have amended Section 3(d) of the PLRA to include mushroom workers in the "agricultural laborer" exclusion. Although the bill passed the House, and was considered on two separate days by the Senate, it was sent back to committee where it died. Clearly, the legislature had the opportunity to include mushroom workers in the "agricultural laborer" exception in Section 3(d) but failed to do so. Consequently, we decline to do judicially what the legislature did not do legislatively. Accordingly, we hold that the Board did not err in concluding that mushroom production workers such as Employer's employees are not "agricultural laborers" within the meaning of Section 3(d) of the PLRA. Therefore, said employees are covered under the PLRA.

## II.

Employer's second argument is that the Board erred by issuing an order of certification based on an election which the Board conducted in violation of the requirement in Section 7(c) of the PLRA, 43 P.S. § 211.7(c), that the Board conduct a secret ballot election within 20 days of a party's request for a 20-day election. Employer contends that the May 30, 1997 election was held 21 days after the Union's May 9, 1997 representation petition, which included a request for a 20-day election. Section 7(c) of the PLRA provides:

Whenever a question arises concerning the representation of employes the board may, and, upon request of a labor organization, or an employer who has not committed an act herein defined as unfair labor practice, or any group of employes in an appropriate unit repre-

senting by petition thirty per centum or more of the employes of that unit, shall investigate such controversy and certify to the parties, in writing, the name or names of the representatives who have been designated or selected. In any such investigation, the board shall provide for an appropriate hearing upon due notice, either in conjunction with a proceeding under section eight, or otherwise, and may utilize any suitable method to ascertain such representatives, *except that if either party to the controversy so requests, a secret ballot of employes shall be taken within twenty days after such request is filed.* Any certification of representatives by the board shall be binding for a period of one year, or for a longer period if the contract so provides, even though the unit may have changed its labor organization membership.

43 P.S. § 211.7(c) (emphasis added).

Employer cites *Petition of Shafer*, 347 Pa. 130, 31 A.2d 537 (1943), for the proposition that under Section 7(c), a 20–day election is mandatory if requested by either party. Employer cites the following language in *Shafer*:

> In the present case, the Board has no authority whatever to ignore the request of the union for a secret ballot within twenty days. Under the Act, it was *mandatory* upon the Board to comply with that request. Although the request was not pressed, it was not withdrawn. Certainly, it was futile for the Board to deny that it was made. The employer also requested an election. Under the Act, as amended, the Board had no discretion to refuse. Regardless of the manner in which it has hitherto construed its powers, it must comply with the same statute of which it is a creature. It has no powers otherwise.

*Id.* at 136, 31 A.2d at 540.

In response, the Board does not dispute Employer's contention that a 20–day election request under Section 7(c) is mandatory. However, the Board does claim that

*Shafer* also recognizes the right of a party to withdraw a 20–day election request, as indicated by the language: "Although the request was not pressed, it was not withdrawn." *Id.*

As indicated by the record, in its May 21, 1997 letter to the Board, the Union, acknowledging that an election on May 30, 1997 would be one day late, withdrew its initial 20–day election request and simultaneously requested another 20–day election. The Board contends that there is nothing in the PLRA or any case authority which would prevent the Union from withdrawing its initial election request or from asserting another such request after the first request had been withdrawn.

■ We agree with the Board. The Supreme Court's language in *Shafer* supports the Board's position that the Union was entitled to withdraw its 20–day election request. Furthermore, there is no authority for Employer's apparent position that the Union should not be permitted to file another 20–day election request after the first one was withdrawn. As a result, we hold that the May 30, 1997 election was timely held within 20 days of the Union's second election request and that the Board did not violate the 20–day requirement of Section 7(c) of the PLRA.

### III.

Employer's third argument is that the Board deprived Employer of its due process rights and statutory rights under the PLRA by the actions it took permitting the Union to withdraw its initial 20–day election request and assert a second 20–day request. Employer contends that it was not served with the Union's May 21, 1997 letter to Board wherein the Union withdrew its initial election request and asserted a second election request. Employer contends that it was not until five months after the election, on October 27, 1997, that it first learned of the May 21 letter. Employer claims that had it known about the May 21 letter, it could have

insisted that the election be held within the original 20 days, could have required the Board to hold a pre-election hearing to resolve bargaining unit issues, or could have delayed the election to the end of the 20–day period.

Employer further contends that the May 21 letter was never made a. part of the record and that the Board ruled against Employer based on evidence that was not of record. Employer claims that the Hearing Examiner determined in a November 25, 1997 letter that he was not admitting the May 21 letter into evidence at that time. (*See* R.R.670a).

In response, the Board contends that the May 21 letter was made a part of the record when it was filed with the Board on May 22, 1997, as reflected by the Board's docket entries. (*See* R.R. 1a). In its Final Order, the Board, in addressing the Union's motion to supplement the record, which was opposed by Employer, stated:

> The Board sees no need to supplement the record made before the hearing examiner to include the Union's letter received by the board in the normal course of business on May 22, 1997. The letter is time-stamped as received by the Board on that date and is signed by counsel for the union. The Union readily acknowledges that it wrote the letter which was received by the Board and placed in the Board's file. It is as much a part of the record in this case as the initial twenty day request filed by the Union with its petition. Accordingly, the Employer's challenge to the authenticity of the letter is without merit.

(Board's Final Order, p. 7; R.R. 831a).

The Board further contends that despite not having been served with the Union's May 21 letter, Employer was aware that the Union had withdrawn its initial election request and asserted its second election request, as reflected by the Employer's June 6, 1997 exceptions wherein Employer challenged the Board's conduct of the election, *inter alia,* on the ground that the Union had withdrawn its first request and asserted a second request. In its July 3, 1997 notice of hearing on objections to the election, the Board directed Employer to file its objections to the election date, including the objections filed on June 6, 1997, as exceptions .to the nisi order of certification. (R.R. 26–27a).

Even accepting Employer's position that it was not aware of the Union's May 21 letter until October 27, 1997, the Board contends that Employer failed to raise any evidentiary or due process issues concerning the May 21 letter in its April 9, 1998 exceptions to the Board's March 23, 1998 nisi order of certification. As a result, the Board argues that Employer has waived its. due process challenge to the Board's actions taken in conjunction with the May 21 letter.

A review of Employer's April 9, 1998 exceptions to the Board's nisi order of certification does not indicate that Employer raised any evidentiary, due process or statutory challenges based on the Union's May 21 letter. (*See* Employer's Statement of Exceptions to Nisi Order of Certification, pp. 1–4; R.R. 714–717a). Issues not preserved by the filing of exceptions or raised before the agency cannot be considered on appeal. Pa. R.A.P. 1551(a); *Township of Upper Saucon v. Pennsylvania Labor Relations Board,* 152 Pa. Cmwlth. 530, 620 A.2d 71 (1993). Consequently, Employer has not preserved for appeal the issue of whether its due process or statutory rights were violated by the Union's May 21 letter.[14]

---

**14.** Even assuming that Employer had properly preserved the issue of whether its due process rights were violated because it was not served with the May 21, 1997 letter, we nevertheless agree with the Board that Employer was in no way prejudiced by not being served with the letter because where a party makes a 20–day election request under Section 7(c), the opposing party has no right under the PLRA to either request a pre-election hearing or to insist that the election be held on a certain date. Section 7(c) of the PLRA, 43 P.S. § 211.7(c); *Petition of Shafer.* Moreover, in accordance with *Shafer,* a party may with-

## IV.

Employer's fourth argument is that its employees could not exercise a free and reasoned choice in the representation election because the Board conducted the election in an inappropriate bargaining unit. Employer claims that the Board erred in conducting the election before the appropriate bargaining unit could be determined.

Employer maintains that the notice of election identified all of Employer's production and maintenance workers as eligible voters, thus leading the voters to believe that they were all to be included in a wall-to-wall bargaining unit consisting of all 11 hourly production and maintenance classifications. However, as Employer points out, the Hearing Examiner and the Board found only 6 of the 11 classifications to be appropriately included in the bargaining unit.

Citing a lack of Pennsylvania state law on the subject, Employer cites several federal court decisions involving elections held by the NLRB where the courts ordered new elections because the appropriate bargaining unit had not been determined prior to the election. *See NLRB v. Beverly Health and Rehabilitation Services,* 120 F.3d 262 (4th Cir.1997) (one job classification removed from unit); *NLRB v. Parsons School of Design,* 793 F.2d 503 (2d Cir.1986) (one job classification removed from unit); *NLRB v. Lorimar Productions, Inc.,* 771 F.2d 1294 (9th Cir.1985) (one job classification removed from unit); *Hamilton Test Sys. Inc. v. NLRB,* 743 F.2d 136 (2d Cir.1984) (two job classifications removed from unit). Employer contends that these cases all stand for the proposition that under the NLRA, an election may be invalidated in circumstances where the appropriate unit differs from the pre-election unit; and that in the instant case, 5 of the 11 job classifications did not belong in the unit.

Although the NLRB requires new elections on a case-by-case basis, Employer, in the case *sub judice,* submits to this Court that we should impose a *per se* mandating a new election when the appropriate bargaining unit differs from the pre-election unit. Employer's reason for such a rule is that unlike the NLRA, the PLRA's 20–day rule does not provide for pre-election hearings.

In response, the Board contends that the federal cases cited by Employer are inapplicable to the case at bar because the NLRA contains no provision similar to Section 7(c) of the PLRA, 43 P.S. § 211.7(c), which mandates that a Board conduct an election within 20 days of a party's election request. *Petition of Shafer.* Consequently, the appropriate unit must be determined after the election. As specifically set forth in the notice of election in the case at bar: "Under Section 7(b) of the PLRA [43 P.S. § 211.7(b) ], the Board will determine the appropriateness of the unit later, but due to the twenty (20) day election request, the election must be conducted now." (Board's May 22, 1997 Order and Notice of Election, pp1–2; R.R. 12–13a).

Clearly, the election procedure under the PLRA differs from that in the federal cases cited by Employer, where the election was held invalid because the appropriate unit was not determined prior to the election. However, as noted above, in *American Fed'n of State, County and Mun. Employees v. Pennsylvania Labor Relations Board,* this Court recognized that there is no authority which would require the Board, when deciding questions of state law, to follow federal decisions involving questions of federal law, especially where it is different from state law. 529 A.2d at 1190.

Such is the case here. By including the 20–day election provision in Section 7(c) of

draw its 20–day election request at any time. There is also no authority in the PLRA or case law stating that a party is prohibited from

filing a second election request after withdrawing the first request.

the PLRA, the General Assembly weighed the employer's and the union's interests in having a quick election against the employees' interests in having exact information regarding the composition of the bargaining unit. Even though the exact bargaining unit had not yet been determined, the legislature chose to afford the parties the right to request a speedy election within 20 days.

In view of the fact that Section 7(c) of the PLRA mandates that an election be held within 20 days of a party's election request and that no such similar provision exists in the NLRA, we conclude that the federal cases cited by Employer, for the proposition that the appropriate bargaining unit must be determined before the election, are inapplicable. The PLRA differs from the NLRA because the General Assembly has determined that the parties' interest in a quick representation election takes precedence over the employees' right to be aware of the exact bargaining unit prior to the election. In any event, the PLRA provides that either party may challenge any ballot after the election. Consequently, we reject Employer's contention that its employees were denied a free and reasoned choice in the election because the appropriate bargaining unit was not determined prior to the election.

For the foregoing reasons, the order of the Board is affirmed.

### ORDER

AND NOW, this 27th day of July, 1999, the October 20, 1998 Final Order of the Pennsylvania Labor Relations Board is hereby affirmed.